Argued May 25, reversed and remanded July 13, 1920.

WARD v. McKINLEY.

(191 Pac. 322.)

Contracts—Test of Mutuality of Contract to Furnish Lumber Stated.

1. A contract to furnish lumber, if the purchaser is bound thereby to order and receive the minimum amount of lumber provided for so that the sellers would have a remedy for damages for failure to order such amount, is not wanting in mutuality; but, if the purchaser is not so bound, it is a mere option, failure to exercise which creates no liability.

Contracts—Courts Should Incline to Construe Contract in Favor of Mutuality.

2. Courts should incline, where such a construction is reasonable, to construe a contract in favor of mutuality.

**Contracts—Contract for Delivery of Lumber Under Specifications Which Purchaser Should "Furnish" Held Mutual.**

3. A contract, whereby plaintiffs were to cut a minimum amount of lumber each year for defendants, defendants to furnish specifications whereby it was to be delivered and to pay for all lumber shipped on orders furnished by the purchaser, *held* not void for want of mutuality in failing to require defendants to order lumber; the agreement to hold the entire output subject to plaintiff's order and not to sell it to other parties being a sufficient consideration, and the word "furnish" meaning to be furnished.

From Deschutes: T. E. J. DUFFY, Judge.

Department 1.

This is an action for damages for breach of a contract for sale and delivery of lumber. The facts, as alleged in the complaint, are as follows:

"II.   That on or about July 2, 1917, said defendants as such copartners made and entered into a certain contract with plaintiff, whereby for a valuable consideration said defendants agreed to sell and deliver to plaintiff, f.o.b. cars at Bend, Oregon, and plaintiff agreed to buy all of the one-inch and thicker grades of No. 3 common and better pine lumber that said defendants should saw and manufacture at their mill situated on the northwest quarter of the northeast quarter (NW.¼ NE¼) of Section 26, Township 18 south, Range 12 east, W. M., Deschutes County, Oregon, during the period from the 21st day of May, 1917, to the 1st day of January, 1920.

"III.   That by the terms of said contract defendants agreed to saw, manufacture and deliver unto plaintiff during the period covered by said contract, a total minimum of ten million (10,000,000) feet of lumber, board measure; and that defendants by said contract further agreed that they would saw, manufacture and deliver to plaintiff at least four million (4,000,000) feet, board measure, of lumber for each sawing season covered by said contract; all of which plaintiff agreed to pay for according to the terms and conditions of said contract.

"IV.   That of the four million (4,000,000) feet, board measure, of lumber which defendants by their

said contract agreed to saw, manufacture and deliver to plaintiff for the sawing season of the year 1917, defendants have delivered to plaintiff six hundred twenty-eight thousand two hundred and thirty-one (628,231) feet, board measure, of lumber, and no more, leaving a balance of three million three hundred seventy-one thousand seven hundred sixty-nine (3,371,769) feet, board measure, of lumber which defendants have failed, neglected and refused to deliver to plaintiff under said contract for said sawing season of the year 1917; and that defendants have delivered elsewhere all of the remainder of the output of their said sawmill for the said sawing season of the year 1917, after the date of the commencement of said contract, in breach of the conditions of their said contract with plaintiff.

"V. That the sawing season of the year 1918 has more than half elapsed and that of the four million (4,000,000) feet, board measure, of lumber agreed to be sawed, manufactured and delivered to plaintiff by defendants under said contract for said sawing season of the year 1918, two million (2,000,000) feet, board measure, or more, should have been delivered to plaintiff prior to this date; that defendants have failed, neglected and refused to deliver unto plaintiff any lumber at all from the lumber sawed and manufactured at their said sawmill during said sawing season of the year 1918, but have delivered and are continuing to deliver elsewhere all of the output of said sawmill for said sawing season of the year 1918, in further breach of their said contract with plaintiff.

"VI. That plaintiff has fully performed all of the conditions of said contract on his part required to be performed, in so far as the acts of the defendants have permitted such performance; and that plaintiff has been at all times since said contract was entered into and is now ready and willing to perform all of the conditions thereof on his part to be performed.

"VIII. That by reason of the failure, neglect and refusal of defendants to deliver unto plaintiff all of

the four million (4,000,000) feet, board measure, of lumber contracted to be delivered under said contract for the season of the year 1917, as hereinbefore set forth; and by reason of the failure, neglect and refusal of defendants to deliver any of the two. million (2,000,000) feet, board measure, of lumber which by the terms of their said contract they were required to deliver to plaintiff prior to this date from the output of their said sawmill for the sawing season of the year 1918, plaintiff has been damaged in the sum of $48,345.92.''

There was a second cause of action pleaded, but the same is not material here.

Defendants answered denying every allegation in paragraph II of the complaint, except that they admitted the execution of a certain contract with plaintiff on July 2, 1917, which contract was made an exhibit to the answer, and is as follows:

''This agreement made and entered into this 2d day of July, A. D. 1917, by and between A. M. McKinley, S. L. Hampson and P. F. Hampson, co-partners doing business under the firm name and style of McKinley-Hampson Lumber Company of Bend, Oregon, parties of the first part, and G. F. Ward of Spokane, Washington, as party of the second part, Witnesseth:

''That for and in consideration of the sum of one ($1.00) dollar, lawful money of the United States of America, paid by party of the second part to parties of the first part, the receipt whereof is hereby acknowledged, the parties of the first part hereby agree to sell and do hereby sell and agree to deliver unto party of the second part, all the one (1″) inch and thicker of the grades of No. 3 common and better pine lumber that parties of the first part saw and manufacture at their mill situated on the northwest quarter of the northeast quarter of Section 26, Township 18, south, Range 12 east, W. M., Deschutes County, State of Oregon, during the period from the

21st day of May, 1917, to the 1st day of January, 1920.

"Said parties of the first part agree that the minimum amount of lumber that they will saw, manufacture and deliver unto party of the second part, under the terms of this contract, will be at least four million (4,000,000) feet, board measure, for each sawing season, making a total minimum of ten million (10,000,000) feet, which said party of the second part agrees to pay for according to the terms and conditions hereinafter set forth, Provided, however, that said first parties shall not be compelled to furnish said amount of lumber in any one season or altogether if prevented by some contingency or happening beyond their control.

"Said parties of the first part agree to log, saw, pile, surface, cut, mill, plane, or otherwise work and deliver said lumber f.o.b. cars at Bend, Oregon, at such times, in such quantities and in such manner as party of the second part may from time to time direct. Said parties of the first part further covenant and agree to deliver unto party of the second part all of said lumber free and clear of taxes, claims, liens or encumbrances of every nature, description and kind.

"Said parties of the first part further guarantee and agree that all shop lumber of 5/4 and thicker surfaced two sides to standard thickness or shipped rough, shall not weigh in excess of twenty-four hundred (2400) pounds per thousand feet, and that all one (1″) inch pine lumber, surfaced two sides or otherwise worked, shall not weigh in excess of two thousand one hundred (2,100) pounds per thousand feet, and that any freight caused by excess over said stipulated weights shall be paid by parties of the first part.

"Said parties of the first part further covenant and agree to insure all lumber on which advances have been made for at least twelve ($12) Dollars per thousand feet, board measure, said insurance to be placed in a reliable insurance company, the premium thereon to be paid by parties of the first part, the

97 Or.—4

policies to be made payable to the party of the second part as his interests may appear, and said policies to be at once delivered unto said party of the second part. In the event parties of the first part fail promptly to insure said lumber, as hereinbefore provided, then the party of the second part reserves the right to cause said lumber to be so insured, and said parties of the first part agree to pay the costs of obtaining said insurance.

"Party of the second part hereby covenants and agrees to pay for said lumber when manufactured according to the specifications furnished from time to time by party of the second part, and delivered f.o.b. cars at Bend, Oregon, free and clear of all taxes, liens, claims or incumbrances, at the following prices: * *

"Party of the second part agrees, if so requested by party of the first part of this contract, it will advance to parties of the first part Nine Dollars ($9.00) per thousand feet, board measure, for all one (1") inch and thicker #3, and better common and all one (1") inch 'D' select and better lumber that parties of the first part have on hand and in finished piles on the first day of the month, cut the previous calendar month, and said parties of the first part agree to pay unto party of the second part, interest at the rate of eight per cent (8%) per annum on all such advances until the same are either taken up by shipment of lumber or otherwise paid. Said party of the second part to estimate said lumber and furnish the parties of the first part a copy of such estimate, by the 10th day of the month following, and said party of the second part agrees to deliver the money therefor to the parties of the first part in Bend, Oregon, not later than the 14th day of the said month, in order that said parties of the first part can meet their pay-roll and current expenses.

"Said parties of the first part further agree that at the time of receiving of said advancement, to execute unto the party of the second part their joint and individual promissory note for all the moneys so advanced, and to assign unto the party of the

second part, all their right, title and interest in and to the ground and premises upon which the said mill and lumber yard is located. Also to execute unto the party of the second part a bill of sale for all lumber in finished piles, this to include 5/4 and thicker #3, shop and better, on which advances have been made, and #3 common, and one (1″) inch 'D' Select, and better; it being understood by the parties hereto that moneys advanced by party of the second part, on such one inch #3 and better common, and one inch 'D' select and better, will cover all the 5/4 and thicker #3, Shop and better from time to time, as advances are made, until all moneys that have been so advanced by parties of the second part to parties of the first part have been taken up by shipments of said lumber, or otherwise paid, provided, that in case there is not sufficient one inch lumber as above described to cover said advances, said party of the second part will take shop lumber of sufficient quantity to make up such deficiency.

"It is further agreed between the parties hereto that the party of the second part shall have a lien on the lumber output of said mill as hereinbefore described, which is operated by parties of the first part, as security for all advances and other lawful charges now existing or hereafter made, and all lumber upon which an advance is made shall be at the time of said advancement placed in possession of said party of the second part, same to include all 5/4 and thicker #2 Shop and better, which advances are included in the #3 and better common and 1″ 'D' Select and better.

"Said parties of the first part agree that during the entire time of the life of this contract they will not sell, or offer for sale, any of the lumber as hereinbefore described in this contract, except, what lumber green from the sawmill will be necessary to take care of the local trade, with the understanding that the parties of the first part are not to sell any lumber from finished piles, except, as hereinafter provided, or ship any in cars, PROVIDED, that the said parties of the first part hereby reserve the right, and the

said party of the second part grants them the right
to sell not to exceed one-half million (500,000) feet
during any one season; and PROVIDED FURTHER, that
none of such lumber shall be taken from finished
piles, but all of the same to be common and delivered
green from the saw; and provided further, that said
parties of the first part shall be permitted to pile not
to exceed thirty thousand (30,000) feet of 2x4, 2x6,
and 1x12, collectively, to take care of the local trade,
after closing down for the season.

"The party of the second part agrees to pay the
parties of the first part for all lumber that parties
of the first part ship on orders furnished by the
party of the second part, as herein provided, according
to the prices hereinbefore set forth, ninety (90%) per
cent of the face of the invoice, less two (2%) per cent
cash discount, upon the presentation and surrender
by parties of the first part to the party of the second
part, at the office of the party of the second part in
the City of Spokane, Washington, through the Fidel-
ity National Bank of Spokane, Washington, of the
invoice with the original bill of lading attached, for
each shipment so made, deducting from such ninety
(90%) per cent, all advances, and other lawful
charges, if any, on any such shipments or otherwise,
and party of the second part agrees to pay the bal-
ance of such invoice, less advances and lawful
charges, if any, on receipt of railway freight expense
bill by party of the second part from their customers
to whom such lumber may be sold, final shipment of
the lumber in this agreement to be made on or be-
fore January 1, 1920, time being the essence hereof.

"It is further agreed between the parties hereto
that the party of the second part will furnish a com-
petent lumber inspector, said inspector to be accept-
able to the parties of the first part. The duties of
said inspector shall be to inspect lumber as the same
shall be loaded aboard cars and shipped. Said par-
ties of the first part hereby agree to pay the salary
of said inspector, whose inspection at Bend shall be
final."

The answer contained denials sufficient to put all other material allegations of the complaint in issue.

The reply admitted the identity of the contract, pleaded in the answer, and the case came on for trial. The defendants objected to any testimony being offered upon the cause of action above stated, for the reason that the contract was unilateral in that it did not bind plaintiff to order or receive any lumber, and was therefore unenforceable, and the court, sustaining this contention, directed a nonsuit as to this cause of action. The plaintiff thereupon took a voluntary nonsuit as to the second cause of action, and judgment was rendered against him for costs, from which he appeals to this court.

REVERSED AND REMANDED.

For appellant there was a brief and an original argument by *Mr. Ross Farnham.*

For respondents there was a brief over the names of *Mr. H. H. DeArmond, Mr. Charles W. Erskine* and *Mr. Fred L. Everson,* with an oral argument by *Mr. DeArmond.*

McBRIDE, C. J.—1, 2. There is but one question raised on this appeal: Is the contract pleaded in defendants' answer unilateral? If it is, the judgment of the Circuit Court must be affirmed. If not, there must be a reversal. If plaintiff is so bound by the contract, to order and receive the minimum amount of lumber therein provided for, the defendants would have a remedy against him for damages for failure to order such amount, in which event there is no want of mutuality. This is the test. If plaintiff is not so bound, the agreement does not rise beyond the dignity of a mere option to purchase from the failure

to exercise which no cause of ·action will arise. It is a well-established rule of law that courts should incline, .where such a construction is reasonable, to construe a contract in favor of mutuality: *Minnesota Lbr. Co.* v. *Whitebreast Coal Co.,* 160 Ill. 85 (43 N. E. 774, 31 L. R. A. 529) ; *Dreiske* v. *Davis Colliery Co.,* 156 Ill. App. 291; *Rice* v. *Miner,* 151 N. Y. Supp. 983 (89 Misc. Rep. 395).

In the case first above cited, the court said:

"Contracts should be construed in the light of the circumstances surrounding the parties, and of the objects which they evidently had in view. The circumstances, which both parties had in view at the time of making the contract may be referred to for the purpose of determining the meaning of doubtful expressions. Courts will seek to discover and give effect to the intention of the parties, so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it."

The doctrine is well stated in the above excerpt. Courts naturally are reluctant in cases like the present, where parties have deliberately prepared a long and formal contract, with many elaborate provisions, and have gone through the ceremony of signing and sealing it, to say that in spite of all this preparation and careful execution, they are not bound and that no contract has been in fact executed.

If the plaintiff was anything but a schemer and a dishonest man, he intended when he signed his contract that the defendants should understand that he was binding himself to take all the output of their mill, with the exception therein specified, at the prices agreed upon; and the defendants would not, if they were not lunatics, have signed except with that un-

derstanding. It is inconceivable that they would have tied up practically the entire output of their mills for a term of years and agreed to sell to no one but plaintiff, except with the understanding that he was to take that output.

At this stage of the case, in the absence of testimony to the contrary, we are bound to assume that plaintiff was ready and willing to perform every stipulation required of him, and that there has been no default in fact upon his part; that he had ordered, received and paid for 628,231 feet of lumber, and was ready and willing to seasonably order, receive and pay for the remainder, according to contract, and that defendants, on the pretext that the contract was not binding upon their part, refused to furnish him with any more lumber.

3. It is idle to say, and counsel does not seriously contend, that there was no consideration passing to plaintiff. The agreement to hold the entire output subject to plaintiff's orders and not to sell it to other parties, was itself a sufficient consideration.

We have before us, then, an agreement of the defendants, based upon a sufficient consideration, to sell and deliver to the plaintiff all the output of their mill for the period therein specified, to the exclusion of other parties. We will now proceed to construe the agreement as a whole, "taking it by its four corners," to ascertain if its true meaning and intent was to bind plaintiff to take and pay for that entire output, or whether it was intended to give him an option to take or refuse to take it—an option, if he saw fit to do so, to neglect to order a single foot of lumber and to compel defendants to manufacture and pile it in their yard and allow it to rot there at their own expense and without remedy. That such a condition was ever within the contemplation of the par-

ties, when they prepared and executed the elaborate agreement involved in this suit, is not thinkable. If plaintiff is not bound to take what he bound the defendants to sell to him, it must be due to some mistake or deception in the preparation of the instrument, and we are not prepared to say that such is the case.

The contract, by its terms, is an agreement for a present sale and future delivery of lumber. The stipulation is:

"In consideration of one dollar * * paid by the party of the second part to the parties of the first part * * the parties of the first part hereby agreed to sell and *do hereby sell and agree to deliver,*" etc.

The defendants further agree that they "will saw, manufacture, and deliver unto the party of the second part" (plaintiff) "at least four million (4,000,000) feet board measure for each sawing season, * * which said party of the second part agrees to pay for, according to the terms and conditions hereinafter set forth." These stipulations constitute the framework of the contract. It is an agreement to sell and deliver not less than ten million (10,000,000) feet of lumber on the one hand, and an agreement to pay for the lumber so delivered on the other. The manner of delivery and payment are matters of detail.

As to the manner of delivery, it is stipulated that it shall be delivered "f. o. b. cars at Bend, Oregon, at such times, in such manner and in such quantities as the party of the second part may from time to time direct." Meanwhile, it is to be insured by defendants at their expense for the benefit of plaintiff—this clause impliedly recognizing some property right of plaintiff in the lumber even before delivery upon the cars.

The lumber is to be paid for by plaintiff when "manufactured according to specifications *forwarded* from time to time by party of the second part and delivered f. o. b. cars at Bend," etc.

A fair construction of this clause binds plaintiff to not only pay for the lumber when delivered, but to furnish specifications whereby it may be delivered. The word "furnished" cannot be construed to have been used in the past tense, but in the future, and must therefore have the meaning of "to be furnished" and so construed.

Thus, *In. re Freeman,* 27 App. Div. 593 (50 N. Y. Supp. 520), a statute provided that an officer might be removed upon charges "duly furnished." The court held the word "furnished" meant that the charges should be furnished to some official body.

And in *State ex inf.* v. *Lewin,* 128 Mo. App. 149 (106 S. W. 581), it was held that the word "furnish" means to supply; therefore, we conclude that the words "to be furnished" mean by interpretation, that the plaintiff was bound to supply defendants' specifications for the lumber described in the contract.

Taking this construction, and there being no time fixed within which specifications—by which we understand particular kinds of lumber desired in a particular shipment—were to be ordered, the law would imply a reasonable time, which, under all the circumstances, would have been a question of fact for the jury.

Another clause in the agreement provides that—

"the party of the second part agrees to pay the parties of the first part for all lumber that the parties of the first part ship on orders furnished by the party of the second part, as herein provided," etc.

We think the two clauses last cited impliedly bound the plaintiff to furnish orders with reasonable promptness for all the lumber which defendants agreed to sell him, and that all of such orders were to be given and filled during the life of the contract and with reasonable diligence, from time to time during the life of the contract; and that if, after the contract was executed, the plaintiff had delayed unreasonably in furnishing orders from time to time, he would have been deemed to have abandoned the contract and been liable in damages for its breach.

Other clauses in the contract tend to sustain the theory of its mutuality.

Thus another clause reads:

"Final shipment of the lumber in this agreement to be made on or before January 1, 1920, time being the essence thereof."

When we consider the agreement that the lumber was to be shipped upon specifications which, as we interpret the contract, the plaintiff was impliedly bound to furnish, and that the whole quantity produced was to be shipped before January 1, 1920; it is fair to say that the defendants were bound to ship and the plaintiff to seasonably order for shipment all the lumber contracted for before January 1, 1920.

We have found no case cited by either party in which the contract sued upon was exactly like the one here in suit. *Livesley* v. *Johnson,* 45 Or. 30 (76 Pac. 13, 946, 106 Am. St. Rep. 647, 65 L. R. A. 783), is similar in many respects and would seem to justify us in holding that the agreement on the part of the plaintiff to furnish and advance the sum of $9 per thousand, at the request of the defendants, upon certain qualities of the lumber when cut and piled, itself

redeems the contract from the charge of want of mutuality.

That an agreement to buy may be created by implication is the rule announced in many cases.

In *McCartney* v. *Glassford,* 1 Wash. 579 (20 Pac. 423), the plaintiffs in error, defendant in the court below, contracted with Glassford to carry for them 100 tons of produce to the Little Dalles at the rate of one and one-half cents a pound, one half by April 16, and the other half by May 20, 1885; McCartney & Co. to pay the full amount of the freight charges at said rates upon delivery of the shipping receipts, certified as correct by their clerk. An action was brought to recover for freight charges on produce actually transported, and for damages caused by the refusal of the defendants McCartney et al. to furnish the remainder of the 100 tons contracted to be hauled. The defendants in the court below, McCartney et al., demurred on the ground that the contract was not mutual in that they had not bound themselves to furnish 100 tons of freight to be shipped. Concerning this contention the court said:

"The real contention of the appellee, however, seems to be that the contract is wanting in mutuality, binding only the appellee to carry the freight, and not requiring appellant to furnish any; or, even if he is so required, that by the subsequent waiver of time, he is relieved from any time for performance. The rule that, if no time is fixed for the performance of an agreement otherwise regular, a reasonable time will be presumed to have been intended by the parties, we think settles the claim of want of time.

"The remaining question is whether appellant is equally bound by the contract set out above. It is evident that the consideration of appellee's assuming to carry said produce and incurring such liability was the implied promise of appellant to furnish it;

and we believe the law will just as clearly and con-
clusively presume or imply such a promise on his
part as if it had been set out in express words.    To
take any other view of a contract such as this would
permit, in our judgment, a fraud and overreaching.
There was a contract on the one part to carry, and
on the other a contract to pay so much per pound;
and there was from this just as clearly a correspond-
ing and correlative obligation to furnish for carry-
ing.''

Here the price is agreed upon; the quantity of lum-
ber to be delivered is agreed upon; and the date of
final delivery is agreed upon.    Nothing is left, except
the detail as to particular consignments which are
to be made upon orders to be furnished from time to
time by the purchaser, and these by necessary impli-
cation are to be made from time to time before Jan-
uary 20, 1920.    This is a stronger case of mutuality
than that above cited.

The case of *Minneapolis Mill Co.* v. *Goodnow*, 40
Minn. 497 (42 N. W. 356, 4 L. R. A. 202), is also in-
structive.    In this case the plaintiff and defendant en-
tered into an agreement as follows:

''The Minneapolis Mill Company agrees to saw for
said John Goodnow, in its Jones Mill, so called, six
million feet or more of pine logs, said sawing to be
done in good workmanlike manner, and as shall be
directed from time to time by said John Goodnow
or his agent.    Said John Goodnow agrees to pay said
Minneapolis Mill Company for sawing, scaling, load-
ing and delivering at his piling-place,'' etc.

There was no express promise by Goodnow to fur-
nish the logs to be sawed, and he claimed that for this
reason the contract was unilateral, but the court held
that such a promise was implied, saying:

''There is in this agreement no express promise on
the part of Goodnow to furnish, for plaintiff to saw,

the 6,000,000 feet of logs which the plaintiff is to saw for him and as he shall direct. But that is necessarily implied. How could it saw the logs as he should direct, unless he should furnish them? There can be little doubt that, as the parties understood this agreement when they executed it, Goodnow was thereby engaging to furnish the 6,000,000 feet of logs for plaintiff to saw, and the plaintiff was engaging to saw them in the manner and at the prices specified. A third party would so understand it. This being so, the contract was valid.''

It is difficult to distinguish in principle the case last cited from the case at bar. The court then goes on to distinguish the case then under consideration from the case of *Bailey* v. *Austrian,* 19 Minn. 465 (Gil. 465), which is cited by counsel for defendants in this action; the distinction in the Bailey case being that there was no specified amount to be furnished but only such amount as the purchaser ''might want,'' instead of a fixed amount or, as in the present case, the seller's entire output with certain definite exceptions.

To the same effect see *Eastern Ry. Co. of Minnesota* v. *Tuteur,* 127 Wis. 382 (105 N. W. 1067); *Chicago, R. I. & G. Ry. Co.* v. *Martin* (Tex. Civ. App.), 163 S. W. 313; *Thomas Huycke Martin Co.* v. *Gray,* 94 Ark. 9 (125 S. W. 659, 140 Am. St. Rep. 93); *Semon Bache & Co.* v. *Coopes,* 35 Ind. App. 351 (74 N. E. 41, 111 Am. St. Rep. 171).

There is no substantial disagreement between the cases cited above and those cited by defendant's counsel. In all the cases cited by defendants there was some important term, requisite to mutuality, missing and which could not be supplied by reasonable implication.

Thus in *American Refrigerator Transit Co.* v. *Chilton,* 94 Ill. App. 6, the seller agreed to sell and deliver

to the purchaser all the ice the purchaser might require; but it was held unilateral because the contract did not bind defendant to take any ice. This case is very close to the line, and, with all deference to the ability of the court rendering the opinion, the writer is inclined to take a different view from that taken by it; but the case, on the face of it, is easily distinguishable from this case, where there is an agreement to sell the entire output to the purchaser, and not to sell to anyone else, and where the time limit of performance is fixed and the obligation to furnish seasonable orders appears by necessary implication.

In *Santella & Co.* v. *Lange Co.*, 155 Fed. 719 (84 C. C. A. 145), the plaintiff agreed to sell to the defendant (a cigar dealer) as many cigars of a particular brand, as the defendant "desired for his wants." This contract was held unilateral, and it was obviously so, since it left the purchaser at liberty to "desire" any quantity or none at all of that particular brand.

In *American Cotton Oil Co.* v. *Kirk & Co.*, 68 Fed. 791 (151 C. C. A. 540), the action was upon a contract for the sale of oil. The memorandum of the transaction was as follows:

"Dec. 23, 1891.

"American Cotton Oil Co.: 10,000 bbls. prime yellow cottonseed oil at thirty-two and a half cents per gallon, delivered in Chicago, with the option of taking the 10,000 bbls. in tank cars loose at thirty cents per gallon. Deliveries to be made per week as Kirk & Co. desire. Payments ten days after arrival of oil at our (Kirk & Co.) works. * * *"

There was no time specified within which final delivery should be made, and the defendants might have ordered a barrel a week for ten thousand weeks and thus have prolonged the delivery indefinitely. In the

case at bar the final delivery was to be made by January 1, 1920.

This distinction is pointed out and commented on in *Baumhoff* v. *Oklahoma City Electric Co.*, 14 Okl. 127 (77 Pac. 40), where the case was cited.

In *Morrow* v. *Southern Express Co.*, 101 Ga. 810 (28 S. E. 998), the action was for breach of a contract with defendant to carry all the milk plaintiff might offer for shipment at a certain rate of carriage. It was held that this was unilateral because the contract did not bind plaintiff to furnish any milk for shipment, and it is plain that there is no reasonable or necessary implication that plaintiff should furnish any milk for transportation.

Without a further discussion of the authorities cited by able counsel for appellant, it may be said that all the cases cited by him are subject to the same distinctions from the case at bar, as those attempted to be drawn above.

Counsel's theory is ingenious and ably urged, but regard for fair dealing among men dictates that we must hold the contract in suit to have been valid and binding upon both parties, and send this case back for trial upon the merits. It appears from the transcript that in view of the ruling of the court, excluding plaintiff's evidence, both parties waived other causes of action and defense and counterclaim, which they probably would not have done had such ruling not been made. It is only fair that they should be permitted, if they so desire, to so amend and reform their pleadings as to try out all matters at issue between them.

This opinion may seem unnecessarily long, but the question presented is a difficult one, beset by many fine distinctions, and we have tried to so blaze the way that a final trial may proceed without subjecting

the learned trial judge to the necessity of ruling in a moment, as he necessarily must, upon questions which require time for consideration.

The judgment is reversed and the case remanded for trial.                    Reversed and Remanded.

Burnett, Benson and Harris, JJ., concur.