Argued September 18; reversed November 26, 1946

RUDDY *v.* OREGON AUTOMOBILE CREDIT
CORPORATION

(174 P. (2d) 603)

CHARLES W. REDDING, Judge.

*Marvin Swire*, of Portland (with Coan & Rosenburg, of Portland, on brief), for appellant.

*Robert A. Leedy*, of Portland (with C. C. Hall and Carlisle B. Roberts, both of Portland, on brief), for respondent.

BAILEY, J. This is a suit for an accounting brought by plaintiff, S. L. Ruddy, against defendant, Oregon Automobile Credit Corporation, formerly Oregon Bond and Mortgage Company, a corporation. From a decree in favor of the plaintiff, defendant has appealed.

After concluding the introduction of evidence on the question whether plaintiff was entitled to an accounting, an amended complaint was filed. In it plaintiff alleges that, during all the times therein mentioned, he was engaged in the business of buying and selling motor vehicles in the city of Portland, Oregon; that the Oregon Automobile Credit Corporation, then known as the Oregon Bond and Mortgage Company, was a corporation engaged, among other things, in the business of lending money and purchasing conditional sales contracts on motor vehicles; that Sandy Sales and Loan Company was a corporation engaged, among other things, in the business of lending money on motor vehicles as agent for the defendant, and that A. J. Muir was the managing officer of the Sandy Sales and Loan Company. It is then alleged:

"V. That during the year 1937, the plaintiff and the defendant had a course of dealing with

respect to motor vehicles, wherein and whereby the plaintiff purchased used and wrecked motor vehicles from various third persons and repaired and reconditioned them for resale, and wherein and whereby the defendant, acting through the said Sandy Sales and Loan Company, and/or A. J. Muir as its agent, loaned the plaintiff certain sums of money upon such motor vehicles and took as security therefor the title to said motor vehicles as evidenced by the official certificate of title, and wherein and whereby said motor vehicles were left in the possession of the plaintiff, and wherein and whereby such motor vehicles, with one exception, were subsequently sold under the circumstances hereinafter set forth.

"VI. That pursuant to said course of dealing, the plaintiff did during said period purchase the following vehicles and repaired and reconditioned the same for resale, and borrowed from the defendant through its aforesaid agent or agents on the dates set opposite the respective vehicles, the amounts likewise set opposite thereto: * * * [Here follows a list of eleven motor vehicles and the respective amount borrowed on each].

"VII. That thereafter all of said motor vehicles, save and except the above described 1936 Oldsmobile were sold by the Sandy Sales and Loan Company; that each and all of such sales were subject to the control and approval of the defendant and in each instance defendant received the proceeds of such sales, whether in the form of conditional sales contracts, cash, or otherwise, in sums and amounts largely exceeding the aforesaid loans by defendant to plaintiff; that at the time of each of such sales and the receipt by the defendant of the proceeds thereof, the defendant had knowledge of the source of such proceeds and of plaintiff's interest therein."

It is further alleged that the defendant sold the 1936 Oldsmobile mentioned in the preceding para-

graph for an amount unknown to plaintiff and retained the entire proceeds of such sale; that the defendant, upon receiving the proceeds from the sales of the automobiles referred to in the amended complaint "cancelled the loans which plaintiff had received thereon but failed and refused, with respect to all of said vehicles, to pay the plaintiff the excess realized on each and all of said vehicles over the amount of the loans to plaintiff thereon." Plaintiff asks that defendant be required to render an accounting with respect to the transactions set forth in his amended complaint.

Defendant in its answer denies the material allegations of the amended complaint, except those relating to its incorporation and business in which it is engaged and the incorporation of Sandy Sales and Loan Company. Two affirmative defenses, one based on estoppel and the other on laches, are pleaded. The affirmative matter alleged in the answer was put in issue by plaintiff's reply.

It was found by the circuit court that Sandy Sales and Loan Company was defendant's agent in its dealing with plaintiff and based thereon a decree was entered in favor of plaintiff. Defendant asserts that this finding is not supported by the evidence.

The evidence discloses that Ruddy, from 1925 to the first part of the year 1938, was engaged in buying wrecked cars, generally from insurance companies, repairing and reselling them. From 1928 to the latter part of 1935, most of the conditional sales contracts which Ruddy received on cars sold by him were purchased by the defendant. In 1935 a dispute arose between defendant and Ruddy concerning some of the contracts which the defendant was handling for

him and Ruddy was advised by the defendant that it would not have any more business dealings with him. Shortly thereafter Ruddy entered into an arrangement with Sandy Sales and Loan Company, through A. J. Muir, its manager, whereby that company would lend him money on the wrecked cars purchased by him to enable him to repair the same and act as his agent in selling them. Ruddy, who had had an automobile dealer's license up to and including the year 1936, did not renew it after appointing Sandy Sales and Loan Company, which had such a license, his sales agent.

In 1936 Muir organized the Sandy Sales and Loan Company. He was its principal stockholder and manager. All the business of the corporation was conducted by him. For 18 or 20 years prior to its incorporation Muir had been engaged in buying and selling new and used automobiles. This business, which was very extensive, was thereafter conducted in the name of the corporation. Approximately sixty per cent of the business carried on by the defendant was first with Muir and later with the corporation. It lent money to him and later to the corporation with which to purchase and floor new and used motor vehicles. When a motor vehicle was sold by Muir or Sandy Sales and Loan Company on a conditional sales contract, the contract generally was bought by the defendant corporation, the dealer guaranteeing its payment.

The record is not entirely clear as to the number of motor vehicles sold by Sandy Sales and Loan Company for the plaintiff during the year 1936. All the vehicles involved in this suit were sold subsequent to 1936.

When plaintiff purchased a wrecked automobile, he also received a certificate of title therefor en-

dorsed on the back by the registered owner and the legal owner, if any, with the space for the name of the new purchaser left blank. Then plaintiff would take this certificate of title, in the condition in which he received it, to Sandy Sales and Loan Company and borrow a certain sum of money on the motor vehicle represented by it. In the first few transactions he had with that company, which are not involved in this proceeding, he gave a trust receipt on the motor vehicle to it, in addition to the certificate of title. On subsequent transactions only the certificate was delivered to the company. He gave the company no note or other evidence of his indebtedness to it.

Thereafter Sandy Sales and Loan Company would take the certificate of title to the defendant corporation and borrow from one and one-half to three times as much as it had lent to Ruddy. In addition to delivering to the defendant corporation a certificate of title which was in the same condition as when received by Ruddy, Sandy Sales and Loan Company delivered to the defendant corporation a trust receipt, which was on a printed form prepared and in use by the defendant corporation. Such document was, in part, as follows:

"Trust Receipt

"This Trust Receipt Witnesseth: That Oregon Bond & Mortgage Co., of Portland, Oregon, as Entruster, has this day acquired for a new value from the undersigned, as Trustee, a security interest in the following described automobiles, with all attachments, accessories, and equipment as a component part thereof, hereinafter called 'cars', by the delivery or procuring the delivery thereof to trustee, to be held by trustee until _____, 193_____, [the date being inserted] for the purpose of resale:"

Here follows a description of the motor vehicle or vehicles, the model, motor number, serial number, and minimum resale price. The receipt then continues:

"Trustee agrees to hold said cars in trust for entruster as their property and agrees to return all or any part of said cars in good order complete and unused to entruster upon demand, and in any event not later than the above-mentioned date. Entruster at any time may examine said cars and the books and records of trustee with reference thereto. Entruster may, at any time, take possession of said cars without notice or demand and for such purpose it or its representatives may enter the premises of trustee without legal process. ⁕ ⁕ ⁕"

In the transactions between defendant and Sandy Sales and Loan Company, the receipt was signed by the latter company as trustee and the defendant corporation as entruster.

Mr. Muir, after explaining the method in which he financed the purchase of new automobiles, gave the following testimony relating to the financing of used cars:

"Q. But whenever you financed a used car all you took over to them [defendant corporation] was the trust receipt and the certificate of title?

A. Yes.

Q. And you transacted over the period of years with them hundreds and hundreds of used cars?

A. Yes.

Q. They had a set method, did they not, of allowing you so much on a used car?

A. Seventy per cent of book valuation.

Q. And there wasn't any appraisal of those cars in any sense? That was an automatic rule? They would allow you seventy per cent of the N. A. D. A. book? Isn't that correct?

A. Yes.

Q. The N. A. D. A. book is a book that is published by the National Automobile Dealers Association each month showing the retail value of used automobiles? Isn't that correct?

A. Yes.

Q. And that book is the bible of the industry between the finance company and the dealer as to the retail value of automobiles?

A. Yes.

\* \* \*

Q. And that has been your business and your policy with them over the years?

A. Yes.

Q. Then, as I understand it, you would come into the office of defendant in this case with a certificate of title and a trust receipt and you and somebody in the Oregon Bond and Mortgage Company would go to the N. A. D. A. book and they would find out how much seventy per cent of the value was that appeared in that book, and that is the amount of money that they would loan you?

A. Yes.

Q. Then so far as the Oregon Bond and Mortgage Company was concerned, the defendant in this case, they were your automobiles, were they not?

A. Yes.''

Further on, Mr. Muir testified as follows:

"A. \* \* \* When I went to the Oregon Bond and Mortgage—maybe some days I would go in there with twenty-five or thirty cars to floor in one day. The Oregon Bond and Mortgage never asked me any questions where the cars were. Sometimes I bought twenty cars back east in Chicago. and they never even asked me whether the cars were in Portland or where they were. There were no questions asked. I just handed them the titles. made out the work orders, got seventy per cent of the book, and there were no questions asked.

Q. That was following your former relations with them and your former business practices with them that you were the owner of these titles?

A. That is according to their supposition, yes.

Q. When you brought them a certificate of title duly endorsed they assumed that you owned it?

A. Yes.

Q. And each time you came in they didn't say to you, 'Now, Mr. Muir, are you sure you own this car and you are not defrauding us?'

A. No.

Q. That was assumed. You were selling them something for a price and they didn't question your rights; you had the evidence of title in your hand and they didn't go behind that and accuse you of trying to slip something over on them?

A. No, they never even questioned that.

Q. It was understood that you owned those titles based upon your business relations with them?

A. Well, Sandy Sales and Loan had a good financial statement at that time and there were no questions asked regarding where the car was or who owned it.

Q. But in the trust receipt you signed you stated that you would have possession and keep possession?

A. That trust receipt says that."

In 1936, Sandy Sales and Loan Company had a reserve fund with the defendant amounting to $40,000. This fund had been accumulating over a period of years and was retained by defendant as additional security on loans made on certificates of title and trust receipts, and on conditional sales contracts and chattel mortgages guaranteed at first by Muir and later by Sandy Sales and Loan Company. In that year the defendant permitted Sandy Sales and Loan Company to withdraw $10,000 from this reserve fund,

considering that the balance would be sufficient to protect it.

Mr. Ruddy testified that he delivered the certificates of title on automobiles owned by him to Sandy Sales and Loan Company as collateral for money which he borrowed from that company; that he gave them no note or other evidence of indebtedness, and that both he and the Sandy Sales and Loan Company kept a record as to the amount of money he owed. He further testified as follows:

"Q. Now did Mr. Muir advise you at that time what he was going to do with those certificates of title that you had endorsed to him?

A. Well, he didn't advise me. I knew he was getting the money from the Oregon Bond and Mortgage Company.

Q. Did you know what he would do with those certificates of title?

A. Yes.

Q. What would he do with them?

A. He would borrow money on them, or put them in as collateral.

Q. To the defendant, the Oregon Bond?

A. Yes.

* * * * *

Q. [by Mr. Rosenberg] Now, Mr. Ruddy, did you ever go to the defendant or to any of its officers in connection with this transaction that you had with Mr. Muir?

A. Not until January, 1938."

Mr. Ruddy further testified that twice a month an officer of the defendant company, accompanied by Mr. Muir, would check over automobiles in his garage on which money had been lent by the defendant, and at no time prior to January, 1938, did he advise the

officers or agents of defendant corporation that he owned or had an interest in the cars which were being checked.

The amended complaint seeks an accounting as to eleven automobiles. The final decree, however, limits it to eight. Loans on these cars were procured by Sandy Sales and Loan Company from defendant between May 11 and October 5, 1937. Interest on the loans was charged by defendant at the rate of three-fourths of one per cent per month, or nine per cent per annum. It does not appear from the record that the defendant has received any more than the principal on these loans, plus the stipulated interest. During the oral argument, counsel for the plaintiff was asked this question: "Does the Oregon Bonding Company claim a right to more money than they had a loan on?" to which he answered, "No, they claim the right to be paid off on the basis of the amount that they gave Sandy."

At the time these loans were made, defendant assumed that the automobiles were owned by and in the possession of Sandy Sales and Loan Company. Like all similar transactions with Sandy Sales and Loan Company, defendant made no inquiries of it concerning those matters. Twice each month defendant checked with Sandy Sales and Loan Company the cars which it had floored with that company. An officer or agent of defendant company would go to the office of Sandy Sales and Loan Company and, in company with Muir, would check its list against the floored cars on the used car lots (Sandy Sales and Loan Company had two such lots) operated by Muir's company. Some of the cars on the list might be in other places, and in that case Muir, with defendant's

representative, would go there. Muir had several salesmen, or, sub-dealers, as he called them. At times these salesmen would have one or more cars at their homes or at their places of business. Some of the automobiles would be in garages, other than the one operated by plaintiff, being repaired. All, or practically all, the automobiles, on which loans had been made by defendant, in the plaintiff's garage at the time defendant checked them, were there either being repaired or waiting for repairs. Ruddy testified that some of his cars, after being repaired and before they were sold, were stored on a lot under his control about a block and one-half from his garage and near one of Sandy Sales and Loan Company's lots, and that the defendant had checked cars on that lot.

Plaintiff stated that Sandy Sales and Loan Company advanced money to him on his automobiles "against the subsequent selling price that" it was to receive. The interest, if any, that Sandy Sales and Loan Company was to receive on the loans made to Ruddy is not shown by the record. According to plaintiff's testimony, Sandy Sales and Loan Company was to receive 10% commission on the sale price of each motor vehicle sold. Mr. Muir testified that the company was to receive a commission of 15%, plus a flat fee of $20 to cover the cost of advertising and other incidental expenses incurred in connection with the sale. Both agree that Ruddy was to receive the amount of the sale price of each car, less the amount which Sandy Sales and Loan Company was to receive for its services and the amount of its loan to plaintiff.

At the time a loan on a car was arranged between Ruddy and Sandy Sales and Loan Company, the latter

would give to Ruddy its check for the amount thereof with the request that it be not deposited for a day or two, in order to enable Sandy Sales and Loan Company to procure the necessary funds to cover the check. Ruddy, as already stated, testified that he knew that this money was to be procured from the defendant by Sandy Sales and Loan Company delivering the certificate of title to it. Defendant, however, did not know of any of these arrangements between Sandy Sales and Loan Company and Ruddy.

Sandy Sales and Loan Company had an office on one of its used car lots where its records and books were kept. Muir, when transacting business with defendant, sometimes used a table in its conference room. The amount of business which he transacted with that company necessitated his being at its office some days as long as two hours. Other dealers transacting business with the defendant company also used the table. It appears from the evidence that Sandy Sales and Loan Company did not deal with any other finance company. The defendant distributed its blank trust receipts and conditional sales contracts to the Sandy Sales and Loan Company, but it also left similar blanks with other new and used car dealers, as did other finance companies in Portland. There is evidence to the effect that the defendant company also left with the Sandy Sales and Loan Company its blank forms of chattel mortgages which were used in some instances by the latter company in making loans on automobiles, which chattel mortgages were later sold to defendant corporation at a discount. The officers in charge of defendant corporation during the time here involved, but who were no longer connected with that company at the time of the trial, were called as

witnesses by defendant and they emphatically denied that any such chattel mortgage transactions occurred.

This case was tried by plaintiff in the circuit court on the theory that Sandy Sales and Loan Company was acting as defendant's agent in making the loans to him. He adheres to the same theory on this appeal. He does not, nor could he successfully, contend that there is any direct evidence sufficient to establish the fact that Sandy Sales and Loan Company was defendant's agent. Such agency is denied by Muir and defendant's officers, who were familiar with the transactions. Plaintiff, however, argues that such agency has been "proved by circumstantial evidence of the particular course of dealing." He makes no claim of agency by estoppel, nor does he claim that he dealt with Sandy Sales and Loan Company as its agent. It was not until after all the transactions here involved were concluded that he, according to the allegations of his reply, discovered that such relationship existed.

■ This being an equity suit, it is tried in this court "anew upon the transcript and evidence accompanying it." § 10-810, O. C. L. A. When the evidence in a suit is conflicting, some weight should be accorded to the findings of the trial judge as he has had the advantage of seeing the witnesses testify. *Hamlin v. Tharp*, 88 Or. 169, 171 P. 894; *In re Norman's Estate*, 161 Or. 450, 88 P. (2d) 977. However, in this case there is no conflict in the evidence on the question whether Sandy Sales and Loan Company was acting as defendant's agent in making these loans. There is no substantial evidence that Sandy Sales and Loan Company was defendant's agent, or acting as such in the transactions between Sandy Sales and Loan Company and plaintiff. The relationship between the

defendant and Sandy Sales and Loan Company, as shown by the evidence, was that of creditor and debtor, and not that of principal and agent.

In *Kantola v. Lovell Auto Company,* 157 Or. 534, 72 P. (2d) 61, the court adopted the definition of agency given in Restatement of the Law, Agency, § 1, as follows: "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." It is stated in § 15, ibid., that an "agency relationship exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent so to act." See also in this connection 2 Am. Jur., Agency, § 21, p. 24. There is no evidence of any manifestation by the defendant that Sandy Sales and Loan Company might act on its account, nor of any control by defendant over the acts of Sandy Sales and Loan Company in its dealings with plaintiff.

We are also of the opinion that plaintiff is estopped to assert as against defendant that he owned or had an interest in the motor vehicles involved in this proceeding.

In 19 Am. Jur., Estoppel, § 55, p. 661, it is said:

"An estoppel may arise under certain circumstances from silence or inaction as well as from words or actions. Estoppel by silence or inaction is often referred to as estoppel by 'standing by,' and that phrase in this connection has almost lost its primary significance of actual presence or participation in the transaction and generally covers any silence where there are a knowledge and a duty to make a disclosure. The principle underlying such estoppels is embodied in the maxim 'one who

is silent when he ought to speak will not be heard to speak when he ought to be silent.' "

■ And in 31. C. J. S., Estoppel, § 91, p. 310, we find the following:

"Where one who owns or has an interest in personal property, with full knowledge of his rights, suffers another to deal with it as his own by selling or pledging it, or otherwise disposing of it, he will be estopped to assert his title or right as against a third person who has acted on the faith of, and has been misled by, his acquiescence."

See also *Commercial Finance Corporation v. Burke,* 173 Or. 341, 145 P. (2d) 473, 151 A. L. R. 684; *Marshall v. Wilson,* 175 Or. 506, 154 P. (2d) 547; *Keegan v. Lenzie,* 171 Or. 194, at 214, 135 P. (2d) 717.

The statute in effect at the time of these transactions provided for the registration of motor vehicles with the secretary of state and for the issuance by the secretary of state of a certificate of title for each motor vehicle so registered, showing the name of the registered owner and also the name of the legal owner or mortgagee, if any, and further provided that such certificate "shall be prima facie evidence of the ownership of such motor vehicle, or of an interest therein." § 55-201, Oregon Code 1930, as amended by chap. 338, Oregon Laws 1935.

Plaintiff delivered to Sandy Sales and Loan Company the certificates of title to motor vehicles on which loans were made to him by that company with the knowledge that Sandy Sales and Loan Company "would borrow money on them, or put them in as collateral", in its dealings with defendant. He knew that defendant was lending money to Sandy Sales and Loan Company on the motor vehicles represented by these certificates. He was present on numerous

occasions, before and after the transactions here involved, when the defendant's officers were checking motor vehicles, the certificates of title to which had been delivered by him, endorsed in blank, to Sandy Sales and Loan Company, and knew that the defendant claimed some interest in or lien upon those cars. Many of these cars were delivered to Sandy Sales and Loan Company by plaintiff after being repaired and were there checked by defendant. They were sold by Sandy Sales and Loan Company, as owner, with the consent and acquiescence of plaintiff. Plaintiff did not, however, make known to defendant that he was the owner of or had an interest in any of the motor vehicles on which loans had been made by defendant until some three months after the last loan. When plaintiff finally advised defendant of his ownership of the cars, Sandy Sales and Loan Company was insolvent and financially unable to repay the loans made to it on the automobiles here involved. Defendant's loss, due to the insolvency of Sandy Sales and Loan Company, exceeded $25,000, exclusive of such loans.

It is very apparent that defendant was induced by the acts and conduct of plaintiff to make the loans to Sandy Sales and Loan Company. In its dealings with that company, defendant acted in good faith and without knowledge of plaintiff's interest in the motor vehicles.

We are of the opinion that the circuit court erred in entering a decree for plaintiff. Therefore the decree appealed from is reversed and the suit dismissed.