Argued April 4; affirmed May 9, 1950

BLACKBURN *v.* MALONEY ET AL.

218 P. (2d) 459

*John A. Boock,* of Albany, argued the cause and filed a brief for appellants.

*Sam Kyle* argued the cause for respondent. On the brief were Weatherford & Thompson, all of Albany.

Before LUSK, Chief Justice, and BRAND, BELT, ROSSMAN and HAY, Justices.

HAY, J.

J. L. Blackburn is the owner of some 240 acres of timber land in Linn County, Oregon. On August 12, 1944, Blackburn entered into a written contract with C. C. Cameron to sell said timber to him. The agreed price was $6,250. Cameron was given the right, until November 1, 1947, to enter upon the land for the purpose of logging and removing the timber, with the stipulation that, on such date, all his rights in or to the timber should cease. Cameron seems to have given defendants, H. L. Maloney and J. L. Chambers, co-partners doing business as Maloney-Chambers Lumber Company, some interest in the contract, but the extent of such interest is not disclosed. Cameron died,

testate, April 2, 1947. L. L. Swan thereafter was duly appointed administrator c. t. a. of Cameron's estate. On January 5, 1948, Blackburn instituted the present suit, in the nature of a suit to quiet title, against Maloney and Chambers, copartners as aforesaid, Swan, as administrator of Cameron's estate, and Maggie Cameron, Cameron's widow and sole heir at law.

The complaint recites the foregoing facts and alleges that there remains upon the land a considerable quantity of down and standing timber, and that such timber revested in plaintiff on November 1, 1947, and is now owned by him; further, that the defendants now have no right, title, or interest in said timber, but that they claim to have some right therein. Decree is prayed for, adjudging that the rights of the defendants and of each of them in and to said timber were terminated on November 1, 1947, that plaintiff is the owner of such timber, and that defendants and each of them be enjoined from entering upon said land or claiming or attempting to remove said timber.

The defendants made general denial, and pleaded affirmatively: (1) That prior to November 1, 1947, Blackburn, in consideration of the agreement of Cameron to "doze-out" the lines between Blackburn's property and property owned by and under contract to Cameron, and to construct certain fences by the time the logging should be completed, orally extended the time for removal of said timber to November 1, 1948; (2) That, on or about December 19, 1947, Blackburn, and Swan, as administrator aforesaid, entered into an agreement whereby, in consideration of a promise by Swan, as administrator, to "doze-out" certain described lines, to construct fences upon certain described lines, by the time the logging should be com-

pleted, and to cause to be conveyed to Blackburn by the Cameron estate two certain ten-acre tracts, Blackburn extended the time for removal of said timber to November 1, 1948.

The affirmative defenses were denied by the reply.

After a hearing, the court found for plaintiff and decreed accordingly. Defendants appeal.

The principal assignment of error, and the only one that we need consider, is the decree's adjudication that the rights of defendants under the contract terminated on November 1, 1947.

■ Under the type of timber-sale contract before us, the purchaser, upon execution of the contract, became vested with present title to the timber, but upon condition that such title was liable to be defeated by his failure to remove the timber from the land within the time limited. *Anderson v. Miami Lumber Co.,* 59 Or. 149, 151, 116 P. 1056; *Coquille Mill & Tug Co. v. Robert Dollar Co.,* 132 Or. 453, 469, 285 P. 244; *Sandy Holding Co. v. Ferro,* 144 Or. 466, 475, 25 P. (2d) 561; *Rayburn v. Crawford,* 187 Or. 386, 211 P. (2d) 483, 487.

■ If Blackburn orally consented to an extension, and the other party to the contract acted upon such consent, then, upon the principle of estoppel, Blackburn could not thereafter, prior to the expiration of the agreed period of extension, hold the agreement of extension void because not in writing, and treat the contract as if the right of the other contracting party had been forfeited by the expiration of the time originally fixed. *Neppach v. Oregon & Cal. R. R. Co.,* 46 Or. 374, 396, 397, 80 P. 482; *Scott v. Hubbard,* 67 Or. 498, 506, 136 P. 653; *Kingsley v. Kressly,* 60 Or. 167, 174, 111 P. 385, 118 P. 678, Ann. Cas. 1913 E, 746; Annotations, 17 A. L. R. 39; 107 A. L. R. 345.

The defendants assert that the evidence established the oral modification of the contract. Defendant J. L. Chambers testified that, after Cameron's death, in the summer of 1947, he talked with Blackburn, who told him that he and Cameron had agreed orally to an extension of one year. Blackburn, on that occasion, said something about the use for pasture purposes of another piece of land belonging to Cameron, while the timber was being removed, and said that, for the extension, certain fences were to be built. Rolin F. Eastlund, who had been Cameron's bookkeeper, and after the latter's death, worked for the defendant administrator, testified that he talked with Blackburn in the latter part of September, 1947, who told him "that he and Mr. Cameron had agreed to build fences on all property adjoining his [Blackburn's] for a year's extension of the timber contract. At the same time he spoke to me about the exchange of the two ten-acre tracts for the purpose of straightening out the land and making it easier to put in a fence row." Blackburn said he wanted the fences completed by the time the timber was removed. In November, 1947, Eastlund and Alfred J. Owens, who had bought the Cameron property adjoining Blackburn's, talked with Blackburn, and told him that timber had been felled and was lying on the south line, but that fences could be built as soon as such timber was removed. Blackburn said that would be fine. Eastlund's testimony as to the last-mentioned conversation was corroborated by Owens. Robert A. Marsh, who had contracted to purchase Cameron's property lying west and north of Blackburn's testified that defendant Swan wanted him to build a half-mile of fence on the north line of Blackburn's place, and that, prior to the commencement of the present suit, they had run the line and trimmed out the

undergrowth, had ordered wire and staples, and had cut some posts. About April 1, [1948 ?] he inquired of Blackburn if it was all right to clean some treetops off the fence right of way. Blackburn visited the land next day, and agreed. They removed the tops, and have been working on the fence, weather permitting, ever since. Defendant Swan, administrator c. t. a. of the Cameron estate, testified that he holds a power of attorney from defendant Maggie Cameron; that, about November 25, 1947, Blackburn came to his office, and they discussed the exchange of two ten-acre tracts. Then they talked about the fences. Blackburn said very positively that he had agreed to extend the time for one year, upon condition that Cameron would put in good and sufficient fences all along Cameron's land that adjoined Blackburn's, and said that he wanted to trade those two pieces so as to straighten the land and shorten the fence. Swan told him that was satisfactory to him if Owens, to whom he had already contracted the land, would agree to the exchange. He thereupon, in Blackburn's presence, dictated a letter to Owens on the subject. Blackburn left with the distinct understanding that Swan would see to it that the timber would all be removed before the following November 1st, and would by that time have the fences built, provided he could get Owens' consent to trade land. On December 5, 1947, Blackburn came in, and they exchanged deeds. Later, Mr. Orval Thompson, Blackburn's attorney, called Mr. Swan by telephone and told him that Blackburn had instructed him to draw an agreement between Blackburn and Swan. Swan told him: "Fine, if he wants it in writing." Thompson didn't ask Swan what the latter thought should be in the contract. The contract, as drawn by Thompson, was different from Swan's oral agreement with Black-

burn. "The simple contract was, for that extension we were to exchange lands and we were to build good substantial fences there like any husbandman would build." No written contract was mentioned. Blackburn had complained about his fences having been broken down. Swan's letter to Owens, dated November 25, 1947, read as follows:

"As I remember our last conversation it was that within a reasonable time you would come up and you and Mr. Eastlund would go over the situation of the question of trading with Blackburn to more nearly square your land. This I am informed has not been done.

"Maloney and Chambers wish as soon as the spring weather opens up to get into the Blackburn timber and as Mr. Cameron had agreed to build certain fences I deem it important that you make this decision as soon as you can conveniently do so. If it is not made within a reasonable time we will have to go ahead on the basis as the matter now stands because I want to get those fences completed so that Blackburn will have no holler coming."

The evidence on the part of plaintiff was as follows: He himself testified that he never gave any extension of time for removal of the timber. There was some talk of an extension in consideration of building fences, but no agreement was reached. He denied having told Swan that he had agreed to a year's extension. He admitted having exchanged deeds for the purpose of straightening the line, but, as to the claimed extension, said "We practically agreed, but your [Swan's] other men came out there and told me they couldn't do it." He denied being present when Swan dictated the letter to Owens, and also denied telling Eastlund or Chambers that he had given an extension of time to remove the timber. He told Thompson to write a contract between

himself and the Cameron estate, but said that, before
the contract "ever got to" him, Eastlund, saying he
represented the estate, came to him and told him that
they couldn't build the fence. He had an understanding
with Cameron regarding an exchange of lands, but says
this was arrived at probably in 1944, and that it had
nothing to do with any extension of the timber contract.
He admitted talking with Swan, but says the talk was
about the fact that the loggers had knocked down his
fences, and he wanted them fixed up so that he could
use the pasture. At that time the contract period had
expired. His purpose in seeing Thompson was to have
an extension contract drawn, "and if he wanted to sign
them that way, all right, and if he didn't, they could
quit because I was tired of fooling, and the way they
was going, they were not doing anything, and so I went
and got the contracts made." He told Swan about the
bookkeeper [Eastlund] having told him they couldn't
build the fence. Swan called up his logger, and told
Blackburn he would start them right to work on it.
Blackburn waited awhile, but no work was done. Then
he brought suit. Mr. Orval Thompson, attorney for
Blackburn, testified that Blackburn came to his office
and told him that he had an old contract with Cameron
concerning logging of timber. Thompson believes he
said that the time had run out. Blackburn said he was
negotiating with the loggers; and they had been making
various proposals. He wanted Thompson to write
something embodying his ideas, and said he would sub-
mit it to them, and they could take it or leave it. So
Thompson drew a contract. He got Maggie Cameron's
name from Swan, as the proper party with whom the
contract should be made. Mr. Swan said it wasn't
necessary to have a written contract; that he and Black-
burn could reach an agreement, and that he (Swan)

would live up to his end of the bargain. Swan did not tell him that he had already agreed orally with Blackburn.

Swan testified that, if Thompson understood him to say that he and Blackburn could come to an agreement, he was mistaken, because they had already agreed.

■ This is a suit in equity, and, on appeal to this Court, it is tried anew upon the transcript of testimony and the other evidence. *Ruddy v. Oregon Auto. Credit Corp.*, 179 Or. 688, 701, 174 P. (2d) 603.

There is direct and material contradiction between the testimony of the witnesses on either side. It is usually a difficult matter to weigh conflicting testimony when one has to depend upon reading it upon a typewritten transcript rather than hearing it from the lips of the witnesses. However, certain facts we may reasonably deduce from Mr. Swan's letter to Mr. Owens. First, it seems clear that the agreement between Blackburn and Cameron to exchange lands was either separate and apart from any extension of the logging contract, or, if it was a part of an extension agreement, it had been broken either by Cameron or by Swan, the administrator of Cameron's estate. This may be gathered from the fact that either Cameron or Swan had sold to Owens the very land that Cameron had agreed to give Blackburn in exchange for his, and Owens had not given his consent to the exchange. Moreover, it is evident from the letter that, in the event that Owens would not consent, Swan was ready to proceed with the building of the fences on the existing boundary lines "so Blackburn will have no holler coming." Second, it is apparent that Blackburn had been complaining (hollering) about his fences having been broken down by the loggers, and that he wanted them repaired or

replaced "within a reasonable time". Blackburn's testimony is corroborated by Thompson's, from which it appears that, within a few days, at most, after Blackburn's talk with Swan, Blackburn instructed Thompson to draw a written extension agreement embodying Blackburn's ideas, which was to be submitted to the other party on a "take it or leave it" basis. This agreement was drawn, but was never submitted, because, in the meantime, Eastlund had notified Blackburn that the loggers would not be able to build the fences until after the timber was removed. The result would have been that Blackburn would have lost a season's pasturage of his land, besides taking the chance of the loggers failing to build the fences after having taken the timber.

The burden of proof of the oral extension was upon the defendants. We have stated the gist of the evidence, and after carefully considering it, we have concluded that defendants failed to sustain the burden by a preponderance of the evidence. The trial judge had the advantage of seeing and hearing the witnesses, and we give some weight to his findings upon the conflicting evidence. *Ruddy v. Oregon Auto. Credit Corp.*, supra. But even without this, we feel that the evidence preponderates in favor of plaintiff.

The decree is affirmed, with costs.