GEORGE L. JANTZER AND EMMA E. JANTZER, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 66715, 66716, 66717, 66718.   Filed April 20, 1959.

*Frederick H. Torp, Esq.*, and *Carl M. Brophy, Esq.*, for the petitioners.

*John D. Picco, Esq.*, for the respondent.

FORRESTER, *Judge:* In these consolidated proceedings the Commissioner determined deficiencies in the petitioners' income tax as follows:

| Docket No. | Petitioners | 1952 | 1953 |
|---|---|---|---|
| 66715 | George L. and Emma E. Jantzer | $3,861.14 | $8,087.62 |
| 66716 | Theodore G. and Lorraine Jantzer | 3,843.52 | 7,772.24 |
| 66717 | Lewis L. and Dorothy P. Jantzer | 3,963.22 | 7,959.26 |
| 66718 | Edmund W. and Ethel E. Pease | 3,493.04 | 7,668.64 |

The issue for decision is whether certain partnership receipts qualify for long-term capital gains treatment under section 117(k)(2) or 117(a) of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

George L. and Emma E. Jantzer, husband and wife, and Edmund W. and Ethel E. Pease, husband and wife, were residents of Medford, Oregon, during the calendar years 1952 and 1953. Theodore G. and

---

[1] Proceedings of the following petitioners are consolidated herewith: Theodore G. Jantzer and Lorraine Jantzer, Docket No. 66716; Lewis L. Jantzer and Dorothy P. Jantzer, Docket No. 66717; and E. W. Pease and Ethel E. Pease, Docket No. 66718.

Lorraine Jantzer, husband and wife, and Lewis L. and Dorothy P. Jantzer, husband and wife, were residents of Trail, Oregon, during the calendar years 1952 and 1953. The petitioners' Federal income tax returns for 1952 and 1953 were on a calendar year basis and filed with the director of internal revenue at Portland, Oregon.

Four of the petitioners, George L. and Emma E. Jantzer and Edmund W. and Ethel E. Pease, were partners in the George L. Jantzer Lumber Company, which entered into an "AGREEMENT," hereinafter referred to as the Dwinnell contract, with Stanley W. Dwinnell on February 14, 1946. This Dwinell contract provided, in pertinent part, as follows:

### AGREEMENT

THIS AGREEMENT, Made and entered into by and between STANLEY W. DWINNELL, a single man, of 1217 Plymouth Building, Minneapolis, Minnesota, hereinafter known as Vendor, and GEO. L. JANTZER LUMBER COMPANY, a co-partnership consisting of George L. Jantzer, Emma E. Jantzer, Edmund W. Pease and Ethel E. Pease, of 537 Spencer Street, Medford, Oregon, hereinafter known as Purchaser, WITNESSETH:

The Vendor agrees to sell to the Purchaser, and the Purchaser agrees to buy from the Vendor all merchantable Sugar pine, Ponderosa pine, Douglas fir and White fir timber situate upon the real property belonging to the Vendor in Jackson County, Oregon, described as follows, to-wit:

&ast;  &ast;  &ast;  *  *  *  *

for the purchase price and on the terms and conditions as hereinafter provided.

### PURCHASER TO MANUFACTURE INTO LUMBER

The Purchaser agrees to cut and log all of said timber and manufacture same into lumber at a mill, or mills, to be provided or chosen by the Purchaser in Jackson County, Oregon.

### PRICE, HOW COMPUTED

The Purchaser agrees to pay to Vendor, based upon the lumber to be so produced from said timber, at the rate and in the amounts as follows:
> $8.00 per thousand board feet of Sugar pine;
> $6.00 per thousand board feet of Ponderosa pine;
> $4.00 per thousand board feet of Douglas fir;
> $2.50 per thousand board feet of White fir.

In the event that the market price of lumber shall drop $5.00, or more, and less than $10.00, below the present market value of lumber, the price to be paid therefor, as aforesaid, shall be reduced 50 cents per thousand for each of such species of timber, and in the event that such market price shall drop $10.00, or more, below the said present market price, the price to be paid for such timber, as aforesaid, shall be reduced $1.00 per thousand board feet thereof.

It is further agreed that in the event that the market price of lumber shall increase $5.00 per thousand and less than $10.00 per thousand, the amount to be paid for such timber, as aforesaid, shall be increased 50 cents per thousand, and in the event that the market price of such lumber shall increase xxxxxxxxx [*sic*]

$10.00, or more, per thousand the price of said timber shall be increased in the amount of $1.00 per thousand.

\* \* \* \* \* \* \*

For the purposes aforesaid the market price of lumber as of the 14th day of February, 1946, shall be considered to be the government ceiling price thereof as of this date, and hereafter from time to time the ceiling price of lumber as fixed by the federal government shall be considered the market price thereof, unless the Purchaser in making sales with due diligence in the usual course of trade shall not be able to procure the full ceiling price therefor, in which event the actual price for which such lumber shall be sold shall be considered the market price. The said market price of lumber above referred to shall be considered the price thereof f.o.b. the cars at the shipping point in said County.

If in the production of such lumber the Purchaser shall produce and sell any timber products other than lumber, he shall pay to the Vendor 20% of the amount for which same shall be sold.

### AMOUNT OF TIMBER, HOW COMPUTED

The number of board feet of such timber shall be computed by the amount of lumber to be produced therefrom; and the Purchaser agrees that all lumber so produced shall be marketed by him in the usual course of business, and the purchaser will pay the Vendor for the several species of lumber at the rates above specified in accordance with the board feet of such lumber as shown by such sales.

### PAYMENT WHEN MADE

\* \* \* \* \* \* \*

The Purchaser agrees that on or before the 10th day of each month during the term hereof, it will render to the Vendor a full and accurate account of all timber sold hereunder during the preceding month, as aforesaid, including duplicate invoices of all sales and such other data as may be required in the determination of the volume of such timber, and at the time of the rendering of such accounting it shall pay to the Vendor \* \* \*

### AMOUNT TO BE CUT AND PAID FOR EACH YEAR

Purchaser agrees that he will, during the remainder of the calendar year of 1946 and during each and every year thereafter until all of the timber has been so cut and paid for hereunder, cut and pay for hereunder as above provided at least Three Million board feet of such timber, and if during the said remainder of the year 1946 and during any calendar year thereafter the Purchaser shall fail to so cut and pay for at least Three Million board feet of such timber, he will, on or before the 10th day of January of the succeeding year pay to the Vendor the sum of $4.00 for each and every thousand board feet of the deficiency between the amount so cut and paid for and the said Three Million board feet; the said sum to be so paid to be applied toward the payment of the timber next to be cut and paid for hereunder. Nothing herein contained however, shall release the Purchaser from cutting and paying for at least Three Million board feet of such timber per year, as aforesaid.

Title to all such timber and all products produced therefrom shall be and remain in the Vendor until paid for as herein provided, and in the event that the Purchaser shall leave any merchantable logs in the woods for an unreasonable length of time or shall fail to make sales of such lumber as herein provided the number of board feet contained in such logs and the number of board

feet of such lumber shall be computed according to the usual practice, and the Purchaser will pay therefor upon demand at the rates above provided; provided however, if any of such lumber shall be destroyed by fire any insurance that the Purchaser may carry thereon shall be paid to the parties hereto pro rata as their interest may appear.

### BUILDINGS, ROADS, ETC.

During the term hereof the Purchaser shall have the right to build such roads, construct and operate such camps, mills and other facilities as may be necessary or proper for the conduct of such logging and milling operations.

### OPERATIONS TO COMPLY WITH LAW

*     *     *     *     *     *     *

### MERCHANTABILITY

*     *     *     *     *     *     *

[Method of determination prescribed]

### INSPECTION

Vendor shall have the right at all reasonable times to inspect all operations of the Purchaser hereunder and to examine all records and books of account pertaining to the amount of lumber so produced from said timber and all records of sales thereof.

### LIENS

Purchaser will pay promptly all debts of every kind that he may incur in connection with his operations hereunder, and will not cause, suffer or permit any liens to accrue against such logs or lumber by, through or under him.

### TITLE TO PASS ON PAYMENT

Anything herein contained to the contrary notwithstanding, it is agreed that at and when any of said timber shall be cut and manufactured into lumber and paid for as herein provided, the portion thereof so paid for shall vest in the Purchaser as of that time, and it is further understood that the Vendor does not know or make any representation as to the amount of merchantable timber situate on said premises.

### PERFORMANCE

Purchaser agrees to perform all operations hereunder in a good and workmanlike manner and will use due diligence to minimize the hazards of fire on said premises.

### LOGGING RESTRICTIONS

Purchaser agrees to log all merchantable timber as the operation proceeds in any natural logging area.

No unnecessary damage shall be done to the young growth or to the trees left standing.

Any trees left cut, which contain merchantable material, and which are cut, injured through carelessness, or killed by fire which the Purchaser, its employees or contractors, or employees of contractors, cause by their negligence, or the origin or spread of which he or they could have prevented by exercise of due care, shall be paid for at the contract price fixed by the terms of this agreement. Timber wasted in tops or stumps, timber broken by careless fall-

ing, and any timber merchantable according to the terms of this agreement which has been cut but which is or is not removed from any portion of said premises when operations hereunder are completed, shall be paid for at the contract price for such timber.

Stumps shall be cut not higher than 18 inches on the side adjacent to the highest ground, unless a higher stump will eliminate defects in the first log.

### TITLE TO REVERT TO VENDOR

Upon the termination of this agreement all right, title and interest of the Purchaser in and to any of the timber herein agreed to be sold and in and to any rights whatsoever in and to said premises or any part thereof, shall wholly cease and terminate and all moneys theretofore paid hereunder shall be retained by the Vendor either as payment for timber cut hereunder, as rental and as liquidated damages.

### DEFAULT

Time shall be the essence hereof * * *

### PAYMENT, WHERE MADE

\*        \*        \*        \*        \*        \*        \*

### HEIRS AND ASSIGNS

This agreement shall inure to the benefit of and shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns, provided, however, the Purchaser will not assign its interest in this agreement without the consent of the Vendor in writing first had and obtained.

IN WITNESS WHEREOF, the parties hereto have executed these presents in triplicate this 14th day of February, 1946.

The Trail Creek Lumber Company partnership, hereinafter referred to as the partnership, was formed on April 1, 1946, by all the petitioners except Lewis L. and Dorothy P. Jantzer, who later entered it on January 1, 1951. All the petitioners were members of this partnership during the calendar years 1952 and 1953, and the partnership's principal place of business during that period was Medford, Oregon. The partnership was originally formed to engage in logging and the manufacture of lumber.

On April 15, 1946, the George L. Jantzer Lumber Company made a written assignment of the Dwinnell contract to the partnership, to which were attached Dwinnell's written consent and the partnership's written acceptance.

From April 15, 1946, to December 31, 1949, the partnership cut and removed timber under the Dwinnell contract and from two small tracts of timberland that it had purchased during that same period. This timber was logged, manufactured into lumber, and then sold to customers in the ordinary course of business.

George L. Jantzer, Theodore G. Jantzer, Lewis L. Jantzer, and Edmund W. Pease, four of the petitioners, organized a corporation known as the Trail Creek Lumber Company, Inc., (hereinafter referred

to as the corporation) under Oregon law on December 19, 1949, and each of the above-named petitioners owned a 25 per cent interest in said corporation during the calendar years 1952 and 1953.

The corporation was formed in order to acquire the services of a qualified logger, Lewis L. Jantzer, and his equipment in the execution of the Dwinnell contract, and also to protect the petitioners' rights in that contract. On January 3, 1950, the partnership sold its manufacturing and logging equipment, office equipment, and sawmill site to the corporation. After the sale, the partnership and corporation entered into a loose oral arrangement which we now find was terminable at the will of either party, and did not constitute a binding contract.[2] The oral arrangement was in the nature of a continuing

---

[2] The only evidence in the record concerning this arrangement is the testimony of petitioners' witness, Edmund W. Pease, himself one of the petitioners, and in pertinent part is as follows:

[Direct Examination.]

Q. Was there any understanding in these conversations that you had [conversations between the partnership and the corporation] that any other entity would be permitted to cut the Dwinnell timber?

A. Well, no. Not as long as this corporation performed the—performed properly in the matter. If they did not, why, then, I don't know what the conversation was about anybody else coming in, because we took it for granted that that was a good sound arrangement.

     \*      \*      \*      \*      \*      \*      \*

[Cross-Examination.]

Q. \* \* \* Now, as I understand it, there was no written agreement of any kind between the partnership and the corporation?

A. That's right.

Q. There was no express duration to the arrangement. It had no life, did it?

A. No. No definite termination.

Q. Was the corporation under any obligation to cut the timber?

A. Well, as long as they could pay their bills, they would cut timber.

     \*      \*      \*      \*      \*      \*      \*

Q. Then, if they weren't able to pay for it, they had no obligation to cut and remove the timber?

A. Well, the partnership wouldn't want them to go along and cut if they couldn't pay their bills.

     \*      \*      \*      \*      \*      \*      \*

Q. \* \* \* Did the partnership have to give any timber or sell any timber to the corporation?

A. They did not have to, no.

     \*      \*      \*      \*      \*      \*      \*

Q. One other question as to the oral arrangement between the partnership and the corporation. As soon as payment was made, did you consider that the oral arrangement was at an end and a new one began?

A. No, not necessarily. It was a continuing—a continuing agreement from year to year, as long as both parties carried out their part of it.

Q. Could either party terminate the arrangement as they saw fit, or within their own discretion at any time?

A. I'd say they could.

     \*      \*      \*      \*      \*      \*      \*

[Redirect Examination.]

Q. Well, do you mean by that, Mr. Pease, as long as the corporation was in good standing under its agreement to purchase, that the partnership had any right to withdraw its right to cut timber?

A. I think we did.

     \*      \*      \*      \*      \*      \*      \*

Q. Well, then, do you still intend to say, then, that as long as the corporation is performing its part of the agreement satisfactorily, that the partnership has a right to change its mind?

     \*      \*      \*      \*      \*      \*      \*

offer for the sale of the Dwinnell timber that the corporation actually cut and manufactured and it was accepted by the corporation's act of cutting and manufacturing, with respect to each tree. The oral arrangement also provided that the price of the timber was to be based on the number of board feet of lumber found in the timber cut. The initial price was $15 per thousand board feet for pine and $11 per thousand board feet for fir. Later in 1950, the price per thousand board feet for pine and fir was raised to $21 and $16, respectively, and these prices were maintained during the years 1952 and 1953.

The oral arrangement also covered the few remaining trees on land known as the Onn tract. This land had been acquired by the partnership on March 22, 1951, and the partnership conveyed it to the corporation on June 6, 1951, with an oral reservation in the standing timber.

During 1952 and 1953, the Dwinnell and Onn tracts were logged exclusively by the corporation pursuant to the above-mentioned oral arrangement. The corporation cut the timber on the Dwinnell and Onn tracts, manufactured it into lumber, and then sold the lumber in the ordinary course of business.

The partnership reported the proceeds from the above operation in the following manner in its 1952 and 1953 returns:

| Year | Payments received | Costs | Net profit |
|------|------|------|------|
| 1952 | $108,095.91 | $40,273.13 | $67,822.78 |
| 1953 | 172,290.21 | 60,161.17 | 112,129.04 |

The petitioners treated their respective distributive shares of the above profits on their individual income tax returns for those years as a long-term capital gain. Of the payments received by the partnership, $787.52 and $555.36 represented payments for Onn tract timber for the years 1952 and 1953, respectively.

The partnership's only timber interests during 1952 and 1953 were in the Dwinnell, Onn, and Murhard tracts. The Murhard tract was a cutover quarter section that had been purchased in 1949. During 1952 and 1953, the partnership paid State property taxes on only the Murhard tract, while Dwinnell paid the State property taxes on the Dwinnell tract and the corporation paid them on the Onn tract. The partnership did not carry fire insurance on any timber, and the only agreement between the partnership and Dwinnell with respect to timber loss was contained in the Dwinnell contract.

---

A. Yes. That is a matter, I think that would be entirely up to the parties concerned. I think as far as having the right to stop—to terminate the agreement—I think that we would have the right to do it. Whether we would or not, that's another question.

Q. By "the right to do it," you mean the right to do it by agreement with the corporation, is that what you mean?

A. Yes. I think so.

As of the time it was made on February 14, 1946, the Dwinnell contract conveyed no title to timber and consequently the partnership did not hold the Dwinnell timber for more than 6 months before the sales here in issue.

The loose oral arrangement between the partnership and the corporation existing after January 3, 1950, and during 1952 and 1953 did not constitute a sale or an assignment of the Dwinnell contract, or of intangible rights thereunder, from the partnership to the corporation.

From and after January 3, 1950, the partnership had no trade or business other than selling timber; consequently the sales of the Onn timber cannot qualify under 117(a).

OPINION.

The petitioners' principal contention is that the partnership income they derived from the sale of timber on the Dwinnell and Onn tracts qualifies under section 117(k)(2) of the Internal Revenue Code of 1939.[3] As an alternative they urge that the oral arrangement existing between the partnership and the corporation during 1952 and 1953 amounted to sales of timber and of the Dwinnell contract (or intangible rights thereunder), thus qualifying for long-term capital gains treatment under section 117(a)(4) of such Code.[4]

Neither party questions the reality of the corporation or of its transactions with the partnership; only the characterizations of those transactions are in dispute.

1. Treating first with petitioners' principal contention, to come within the favored treatment granted by section 117(k)(2), the petitioners must prove that (1) the partnership was the "owner" of the timber involved, (2) there was a "disposal" of the timber after it had been held for more than 6 months, and (3) the partnership retained an "economic interest" in the timber after such disposal.

The respondent concedes that the partnership was the owner of the Onn tract timber, but challenges petitioners' contention that the

---

[3] SEC. 117. CAPITAL GAINS AND LOSSES.

  (k) Gain or Loss in the Case of Timber or Coal.—

    *     *     *     *     *     *     *

    (2), In the case of the disposal of timber * * * held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * * the difference between the amount received for such timber * * * and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber * * *

[4] SEC. 117. CAPITAL GAINS AND LOSSES.

  (a) Definitions.—As used in this chapter—

    *     *     *     *     *     *     *

    (4) Long-term capital gain.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income * * *

partnership owned the Dwinnell tract timber from and after the time the partnership became the assignee of the Dwinnell contract on April 15, 1946.

The petitioners' contention is based on the premise that the making of the Dwinnell contract effectuated a present sale of the standing Dwinnell timber, and the partnership took the place of the contracting "purchaser" through the assignment from the "purchaser," which was consented to by the "vendor" in writing.

Whether or not the partnership was the owner of the Dwinnell timber, within the meaning of section 117(k)(2), from the date of such assignment is dependent upon the nature of the interest the partnership obtained under the Dwinnell contract.

The petitioners argue that the Dwinnell contract is indistinguishable from the contract at issue in *L. D. Wilson*, 26 T.C. 474, and therefore effected a conditional sale of the timber with the legal title retained by the timberland owner as a security device, and the partnership being the equitable owner of the Dwinnell timber from the date of the assignment.

We find it quite easy to distinguish the Dwinnell contract from that in *L. D. Wilson, supra*, in the following aspects important to this question:

(1) In *Wilson* the parties agreed upon a price certain per thousand for logs delivered at the mill when the contract was signed; here the parties made complicated provisions for price adjustments both up and down during the life of the contract, and the "purchaser" was bound to manufacture the timber into lumber before measurement and payment.

(2) No similar provision in *Wilson*; here the "purchaser" could produce and sell timber products other than lumber, and pay Dwinnell 20 per cent of the sale proceeds.

(3) In *Wilson* the purchaser was obligated to cut, remove and pay for all timber within 6 years; here no time limit was imposed, "purchaser" agreeing to cut and pay for 3,000,000 board feet each year [5] or to pay at a specified rate for any deficiency; such payment however to be applied toward the next timber cut.

(4) In *Wilson* the purchaser was liable for "any fires occasioned through its operations"; here the "purchaser" is liable for fires "cause[d] by their negligence, or the origin or spread of which he [*sic*] * * * could have prevented by exercise of due care."

(5) In *Wilson* the contract provided that all taxes upon the timber should be paid by purchaser; here the Dwinnell contract is silent, but the evidence shows that such taxes were paid by Dwinnell.

---

[5] The contract recites that Dwinnell does not know or make any representation as to the amount of timber situate on the land.

(6) In *Wilson* the contract contains one simple provision that title to timber and logs shall not pass until paid for; here the Dwinnell contract has two specific provisions regarding the passage of title and a third regarding reversion of title, all set out in full in the findings. We note too that the provision regarding reversion employs the phrase "any of the timber herein agreed *to be sold*." (Emphasis supplied.)

(7) No similar provision in *Wilson;* here the Dwinnell contract was assignable only with Dwinnell's written consent.

Petitioners state quite correctly that the Oregon law is well settled to the effect that the sale of standing timber is the sale of a present interest in real property, such interest or title being subject to divestiture upon broken condition subsequent.

Examination of Oregon cases reveals that the most important single consideration in determining whether this doctrine is to be employed is whether or not the contract being considered has specified a definite and limited time within which the "vendee" must complete the contemplated operations. Thus in *Dunham* v. *Taylor*, 211 Ore. 618, 317 P. 2d 926 (1957), the contract in issue specified a time limit on "vendee" of 7 years. The Oregon Supreme Court relied heavily upon that factor and used it to distinguish the case from *Anderson* v. *Moothart, infra.* In *Blackburn* v. *Maloney*, 189 Ore. 76, 218 P. 2d 459 (1950), the contract called for a single lump-sum payment of $6,250 and specified that all of the timber was to be cut and removed by a date certain a little over 3 years in the future. In deciding that title to timber had passed, the court relied as heavily upon the definite time limitation as it did upon the single lump-sum payment. In *Rayburn* v. *Crawford*, 187 Ore. 386, 211 P. 2d 483 (1949), the court relied heavily upon the contract requirement that the "vendees" remove merchantable saw-timber within a specified time, coupled with the recitation that time was of the essence. In *Kee* v. *Carver*, 95 Ore. 406, 187 Pac. 1116 (1920), the court based its decision upon that portion of the contract reading: "does hereby bargain, sell, and convey unto the vendee * * * all of the sound timber * * * now standing upon [described lands]. * * * The vendee hereby covenants and agrees that he will cut and remove all of the timber * * * by August 1, 1917."

In *Anderson* v. *Moothart*, 198 Ore. 354, 256 P. 2d 257 (1953), the contract in issue was for the purchase of growing timber to be paid for at the rate of $2 per thousand board feet as removed, said price to be increased to $3.50 as the value of the timber increased, presumably through growth. No definite time limitation was placed upon "vendee" and this was the primary factor used by the court in holding that the contract did not effect a sale of standing timber

but did no more than create a license with title passing as and when trees were cut, scaled, and paid for.

Thus we see that the Oregon cases have developed and followed the doctrine that the sale of standing timber is the sale of a present interest in real property (of title to the standing timber) only *where there is a definite and specified limitation as to time placed upon the vendee.* The reason for this rule is quite logical; what is perhaps its best expression is in the case of *Coquille Mill & Tug Co.* v. *Robert Dollar Co.*, 132 Ore. 453, 285 Pac. 244 (1930), where the court states at page 249:

> We believe that we are warranted in taking notice of the facts that in all timber regions there is a very substantial constant risk that the timber may be destroyed by fire, and that as a tree passes its maturity it rapidly declines in value. These facts, together with those previously mentioned, persuade us that it would be unreasonable to believe that the [landowner], for a consideration of a yearly payment of $5,000, granted to another an indeterminable privilege to buy this timber. * * * [Quoting with approval *Hendrickson* v. *Lyons*, 121 Wash. 632]: "Parties may so frame their contract as to give the purchaser of timber an unlimited time for its removal, but if this be the intention, it must be clearly and definitely expressed. * * * " * * *

The other facts considered by the Oregon Supreme Court in *Coquille* were that under the contract there in issue the vendee was not required to pay for the logs until after the trees were felled, that the landlord paid the taxes and that the landlord assumed the fire risk.

The court held, page 250:

> Under these circumstances, the contract operated only as a permit or license which authorized the [vendee], or its assignee, to enter upon the premises and cut the timber. *Elliott* v. *Bloyd*, 40 Or. 326 * * *

In reading the Dwinnell contract as a whole in order to ascertain the intentions of the parties (*Elliott* v. *Bloyd*, 40 Ore. 326, 67 Pac. 202 (1902)), we are impressed that no present passage of title was intended and we note specifically that no time limit was specified, that it was silent as to taxes which were in fact paid by the landowner, and that "purchaser" was liable only for fires caused by negligence or allowed to originate or spread through lack of due care. All nonnegligent risk of loss remained with Dwinnell; all the partnership stood to lose was the chance to make a profit by performing.

We hold therefore that the Dwinnell contract conveyed no title but granted to the partnership a license and that the partnership did not become the owner of the Dwinnell timber until such timber was cut, manufactured, and paid for, and thus the partnership's acquisition of ownership was almost simultaneous with its conveyance to the corporation (as individual trees were cut, etc.) and certainly

far less than the required 6 months' period under section 117(k)(2). Even if we were to assume that the actual cutting of the timber vested ownership of the cut timber in the partnership, there is no evidence in the record that would establish that over 6 months elapsed between the cutting of the timber and its subsequent sale.

2. The Onn tract timber was held for more than 6 months prior to its disposal; however, this gain also fails to qualify under section 117(k)(2) because no economic interest in the timber was retained after its disposal. *Ah Pah Redwood Co.* v. *Commissioner*, 251 F. 2d 163, 167 (C.A. 9, 1957), reversing on other grounds 26 T.C. 1197. The oral arrangement between the partnership and the corporation could be terminated at will and the corporation accepted no risk, gave no consideration and was under no obligation to cut any amount of timber. Thus the arrangement was not a contractual disposal of the Onn timber but was in the nature of a continuing offer to sell, which offer was accepted by the corporation with respect to each tree, through the corporation's act of cutting, manufacturing, and paying for that tree. Cf. *Carroll* v. *Commissioner*, 70 F. 2d 806, 809 (C.A. 5, 1934), affirming on this point 27 B.T.A. 65. Obviously the partnership retained no economic interest after such payment, and the partnership did not retain an economic interest in the Onn timber subsequent to its disposal as is required by section 117(k)(2). *Ah Pah Redwood Co.* v. *Commissioner*, *supra* at 167.

3. The petitioners' alternative contention is that the partnership's oral arrangement with the corporation amounted to sales of capital assets held for more than 6 months and thus qualifying under section 117(a).[6] Petitioners state this proposition: "it is immaterial whether this agreement was a sale of timber or the sale of a contract or other intangible right."

Since we have already determined that the Dwinnell timber was not held for the required 6 months' period we will discuss this alternative contention in respect to the Dwinnell contract (or intangible rights thereunder) and in respect to the Onn timber, which was held for more than 6 months.

As to the Dwinnell contract, there was no formal or written sale or assignment, indeed, under its express terms it could not be sold or assigned without Dwinnell's written consent, and this was neither sought nor given; nor was there any sale or assignment of "intangible rights" under that contract. The arrangement was loose, terminable at the will of either party, and, as we have stated, amounted to and resulted in sales of the Dwinnell timber as the same was cut, manufactured, and sold.

---

[6] Petitioners obviously mean section 117(a)(4) and we so treat this contention.

As to the Onn timber, the conclusion that it was not a "capital asset" is inescapable. Section 117(a)(1)(A) excludes from this classification "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The partnership here was originally formed to engage in logging and manufacturing, but on January 3, 1950, all of its equipment and even its sawmill site were sold. Petitioners have failed to show that during the years here in issue it had any property but the Dwinnell contract and some timber, or any activity besides sales of timber; in fact its Form 1065 returns for the years 1952 and 1953, respectively, showed its principal business activity as "Timber sales" and as "Owns timber."

*Decisions will be entered for the respondent.*