A. F. Lowes Lumber Co. v. Commissioner. Estate of A. F. Lowes, Deceased, the First National Bank of Portland (Oregon), Executor, and Ruth L. Lowes, surviving wife, v. Commissioner.
A. F. Lowes Lumber Co. v. Commissioner
Docket Nos. 71689, 71690.
United States Tax Court
T.C. Memo 1960-141; 1960 Tax Ct. Memo LEXIS 145; 19 T.C.M. (CCH) 727; T.C.M. (RIA) 60141; June 30, 1960
*145 1. Timber acquired in the name of partners with funds advanced by a wholly owned corporation, under a plan whereby the timber was to be acquired and owned by the partnership and sold for reasonable stumpage to the corporation for logging and subsequent sale, the stumpage to be credited against the advances made to purchase the timber, held, to be owned by the partnership and not the corporation. Respondent may not disregard the sales from the partnership to the corporation. 2. Sec. 117(k)(2), I.R.C. 1939. - Stumpage credited to partnership by corporation under timber cutting contracts whereby partnership granted corporation the right to enter upon its timber tracts held for more than 6 months and cut all timber on said tracts is entitled to capital gain treatment under sections 117(k)(2) and 117(j). L. D. Wilson, 26 T.C. 474, followed. Ah Pah Redwood Co. v. Commissioner, 251 F. 2d 163 (C.A. 9), remanding on other grounds 26 T.C. 1197; and George L. Jantzer, 32 T.C. 161, distinguished. 3. Substantial amounts of corporate funds withdrawn on open account by stockholder-partners to pay for unrelated speculative ventures of *146 the partnership and a personal residence and personal obligations of stockholder-partners, held, to be dividends, not loans. 4. Dividends allocated between surviving stockholder-partner and estate of deceased stockholder-partner. 5. Sec. 117(k)(1), I.R.C. 1939. - Corporation cutting and selling timber entitled to benefits of section 117(k)(1) with respect to timber cut under timber cutting contracts executed more than 6 months prior to the beginning of the taxable year in which timber cut. 6. Burden of proof is on respondent with respect to new ground for disallowing a loss different from that relied on in notice of deficiency and mentioned for the first time on brief. Frank E. Nash, Esq., American Bank Building, Portland, Ore. Maurice O. Georges, Esq., and Donald R. Holman, Esq., for the petitioners. John D. Picco, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion *147 DRENNEN, Judge: Respondent determined deficiencies in the income tax liabilities of petitioners and an addition to tax as follows: Addition to
Fiscal year
tax Sec.
Docket
ending
294(d)(2),
No.
August 31
Deficiency
I.R.C. 1939
71689
1951
$ 31,601.71
1952
85,156.54
1953
1,896.02
Calendar year
71690
1951
113,211.60
1952
128.020.33
$8,084.59
1953
59,004.25
1954
2,804.82
Petitioner in Docket No. 71689 claims it is entitled to refunds for its fiscal years 1951 and 1952 based upon increased depletion deductions under section 117(k)(1) of the Code. [1] Petitioners *148 in Docket No. 71690 claim they are entitled to a refund for the year 1952 attributable to a net operating loss carryback from the year 1954. By amended answer respondent claimed increased deficiencies for the taxable years in Docket No. 71690 based on an alternative theory therein advanced by respondent. The principal issue, which is common to both docket numbers, is whether certain timber and timberlands acquired after August 31, 1946, in the names of A. F. Lowes and Ruth L. Lowes and paid for with funds of A. F. Lowes Lumber Co., a corporation, and which were later logged by the corporation under timber cutting contracts with a partnership comprised of the two individuals, were actually acquired and owned by the partnership, as urged by petitioners, or were acquired and owned by the corporation, as determined by respondent. Other issues are: "1. Assuming the individuals or the partnership acquired and owned the timber in question, "(a) are the individuals entitled to capital gain treatment with respect to the proceeds received from the disposition of timber under the cutting *149 contracts under section 117(k)(2); "(b) if not, are they entitled to capital gain treatment with respect to such proceeds under section 117(a)? "2. Whether the net disbursement of corporate funds for the use or benefit of the partners and/or the partnership, totaling $470,982.34 in the taxable years, should be treated as loans or dividends. "(a) Alternatively, should the difference between the cost of the timber acquired and proceeds from the sale of that timber, aggregating $364,711.51 in the taxable years, be treated as dividends? "3. Whether any part of the alleged dividends allocated to the partnership or the individuals for the taxable year 1954 is taxable to the estate of A. F. Lowes. "4. Whether the corporate petitioner is entitled to additional depletion deductions and corresponding like amounts of capital gains under section 117(k)(1) for its taxable years ending in 1951 and 1952." By supplemental stipulation filed subsequent to the trial, petitioners in Docket No. 71690 conceded that they were not entitled to a deduction in the taxable years on account of the worthlessness of stock of Lowes Madrones Coal Mining Company. On reply brief respondent conceded that *150 the individual petitioners were each entitled to deduct $75,000 as exploration expenditures made by the partnership under section 23(ff). Petitioners' claim that the increase in deficiencies asserted against the individual petitioners by respondent on an alternative theory first advanced in the pleadings was barred by the statute of limitations was not argued by petitioner and we assume that it has been waived. Certain other subsidiary issues will be determined by a resolution of the above issues. These cases were consolidated for trial. Findings of Fact The stipulated facts are so found. Petitioner A. F. Lowes Lumber Co., hereafter referred to as the corporation, is an Oregon corporation with its principal office in Molalla, Oregon. It is engaged in the logging and sawmill business, including the manufacturing and sale of lumber. The corporation filed its corporate income tax returns on an accrual basis for the fiscal years ending August 31, 1951, 1952 and 1953 with the district director of internal revenue at Portland, Oregon. A. F. Lowes, who died on May 28, 1954, hereafter referred to as decedent, and Ruth L. Lowes. hereafter referred to as Ruth, were at all times material *151 to these cases and prior to his death husband and wife residing at Molalla, Oregon. They filed joint income tax returns on a cash basis for the calendar years 1951 to 1954, inclusive. The estate of A. F. Lowes, deceased, is an estate under the jurisdiction of the Circuit Court of the State of Oregon in and for the County of Clackamas, Oregon, and filed its return on a cash basis for the fiscal year ending April 30, 1955. The partnership of decedent and Ruth filed its information returns on an accrual basis for the fiscal years ending August 31, 1951, 1952 and 1953. The partnership also filed returns for the period September 1, 1953 to May 31, 1954 and for the period June 1, 1954 to August 31, 1954. All of the above returns were filed with the district director of internal revenue at Portland, Oregon. Prior to August 31, 1946, decedent and Ruth were engaged in a number of business and investment activities, including the operation of a tavern in Molalla, the operation of a sawmill under the name A. F. Lowes Lumber Co., and the ownership of timber and timberlands. The sawmill, which employed approximately 10 men, was destroyed by fire in July 1945. Decedent and Ruth replaced it with *152 a new and larger sawmill capable of employing 100 men. As of August 31, 1946, decedent and Ruth owned 27 separate tracts of timber with title held either in the individual name of A. F. Lowes or in their joint names. In the summer of 1946, decedent's accountant, Ray Moran, was of the opinion that the Lowes were in need of tax advice and tax planning with respect to their various business and investment activities. He introduced decedent to Howard N. Dietrich, an attorney and certified public accountant from Portland who specialized in tax practice and who was experienced in the lumber business in the Northwest. Dietrich was retained by decedent in July or August 1946. Dietrich investigated the assets and business affairs of decedent and Ruth, and at sometime prior to August 31, 1946, submitted a plan for the ownership of their assets and the conduct of their business activities. Dietrich recommended the formation of a partnership and the creation of a corporation. According to Dietrich's plan, the corporation was to operate the logging and sawmill business while the partnership was to operate the tavern, to hold the timber and other personal assets of decedent and Ruth, except *153 the stock of the corporation which was to be held by them individually, and to acquire and hold any additional timber or timberlands that would be used in the corporation's business or otherwise. On August 31, 1946, decedent and Ruth executed formal partnership articles which had been drawn up by Dietrich. The partnership was known as "A. F. and Ruth L. Lowes." Articles I through III of this agreement were declarations that timber, timberlands, and the tavern, whether legally held in the names of either or both of the parties, were the property of the partnership "A. F. and Ruth L. Lowes." The 27 tracts of timber owned by decedent and Ruth were described in articles I, II and III. Article IV constituted a declaration that properties then being used in the sawmill business should be transferred to and owned by the corporation. None of the properties thus described which had been held in the individual names of A. F. Lowes or Ruth L. Lowes or in their joint names was transferred to the partnership by a formal instrument of conveyance. It was Dietrich's opinion that under the Uniform Partnership Act, which was in effect in Oregon, no such separate conveyance was necessary. Article V *154 contained the terms of the partnership agreement under which the properties owned by them were to be operated as follows: "That beginning on September 1, 1946, the parties shall operate all the properties owned by them, excepting the stock of the A. F. Lowes Lumber Co., as partners under the following conditions: "(a) The partners shall have equal right or management of the business, and either shall have the right to sign checks, bills of exchange and other instruments in the name of the partnership. "(b) Ruth L. Lowes shall manage the affairs of Frank's place and for such services shall receive a salary of $300.00 (Three Hundred Dollars) per month. "(c) The Tavern known as Frank's Place shall continue to be operated under that name. "(d) All profits or losses of the partnership, after the salary of Ruth L. Lowes, above provided, shall be shared equally by the partners. "(e) The partnership may be terminated upon thirty days written notice of either partner to the other. * * *
"(f) In the event of the death of either partner, the surviving partner shall have the privilege of buying the deceased partner's interest in the business for an amount equal to the appraised *155 value of such deceased partner's interest as fixed by the appraisers of the estate of said deceased partner." The corporation was organized on August 29, 1946 with an authorized capital of 500 shares of no-par-value stock issued equally to decedent and Ruth pursuant to the following resolution of the stockholders: "WHEREAS, A. F. Lowes and Ruth L. Lowes have offered to transfer all of the assets subject to the liabilities of the business known as A. F. LOWES LUMBER COMPANY in exchange for all of the capital stock of this Corporation and "WHEREAS, in the judgment of the stockholders, such assets less the liabilities have a reasonable fair value equal to the amount stated on the accompanying list, to-wit: $96,160.47; now, therefore, "BE IT RESOLVED: That A. F. Lowes and Ruth L. Lowes' proposal be accepted and that upon the transfer of the said assets, that this Corporation assume the liabilities listed and issue all of its capital stock to A. F. Lowes and Ruth L. Lowes or their nominees." The entire capital stock of the corporation was issued to and held equally by decedent and Ruth until decedent's death. The sawmill site was conveyed by decedent and Ruth to the corporation *156 by a warranty deed and a quitclaim deed each dated September 4, 1946. None of the timber or timberlands was transferred to the corporation because two important objectives of Dietrich's plan were to protect the tavern and the timberlands, which were to be held by the partnership, from the risks involved in the expanding sawmill business, and to obtain the benefits of any tax advantage that might be had through separation of the ownership of the timber and the operation of the sawmill. It was also a part of Dietrich's plan that all timber acquired after August 31, 1946 was to be acquired by the partnership in the names of A. F. Lowes and Ruth L. Lowes, the acquisition of which could be financed by funds borrowed from the corporation. The timber would then be sold to the corporation whenever needed, under cutting contracts executed by the partnership and the corporation, and the loans from the corporation to the partnership would be repaid by credits to the partnership's account on the corporation's books of the stumpage provided in the cutting contracts as the timber was cut and removed by the corporation. Dietrich prepared a "Timber Cutting Contract" which was retained in the office *157 of the corporation and was executed by the partnership and the corporation before each tract of timber was entered by the corporation, the various contracts differing only with respect to the legal description, the price, and the date of execution. The form of the timber cutting contract was as follows: "TIMBER CUTTING CONTRACT "In consideration of the mutual covenants herein contained, A. F. and Ruth L. Lowes, a partnership, does hereby agree to sell to A. F. Lowes Lumber Co., an Oregon corporation, all the timber on the following described premises: "V. E. Kover property located on the N.E. 1/4 of Section 13, T. 5. S., R. 3. E., W.M., Clackams County, Oregon. "The buyer is hereby granted the right to enter said premises and remove said timber, paying therefor the sum of $6.00 for each thousand board feet of timber removed. Ownership of said timber shall remain in the sellers until it has been removed from the premises in the form of logs. "Dated at Molalla, Oregon, this 1 day of September, 1946. A. F. and RUTH L. LOWES By A. F. LOWES Partner A. F. LOWES LUMBER CO. By R. F. MORAN Secretary" Notwithstanding Dietrich's advice, prior to September 1947, the corporation *158 acquired 12 tracts of timber and 8 parcels of timberland in its own name. When Dietrich discovered that the corporation was purchasing timber and timberlands, he advised the Lowes that they had been following the wrong procedure and that the partnership should buy all timber and timberlands. Thereafter, Dietrich's plan was adhered to, with all timber purchased for the partnership until August 1951. When Dietrich discovered upon auditing the corporate books in August 1951 that the drawing account of the partnership had a debit balance in excess of $376,000, he advised Lowes against withdrawal of corporate funds unless absolutely necessary. Thereafter Lowes discontinued timber purchases in the name of the partners, but he continued to draw on corporate funds for other personal investments and expenditures. The following resolution was adopted by the board of directors of the corporation on September 8, 1947: "Whereas this corporation is in need of timber to operate its sawmill, and; "Whereas A. F. and Ruth L. Lowes have offered to sell stumpage to this corporation as it is needed for a price of $10.00 per thousand board feet, and; "Whereas, in the opinion of this Board, such *159 offer is fair and the price is not in excess of the fair market value of such stumpage; "Now Therefore, Be It Resolved that this Corporation purchase timber from A. F. and Ruth L. Lowes and cut such timber and pay the sellers $10.00 per thousand board feet for such stumpage. "Be It Further Resolved that this price of $10.00 per thousand continue until changed by mutual consent of the parties." A. F. Lowes personally located and selected the timber and timberlands to be purchased. After August 1947 when a particular tract was purchased, a deed, timber deed, bill of sale, or other instrument conveying the property to A. F. and Ruth L. Lowes would be obtained from the vendor. Each time timber was thus purchased, the corporation would issue a check for the amount of the purchase price payable to the vendor. As each check was issued, a debit was entered to the account of A. F. and Ruth L. Lowes, hereafter referred to as the partnership account, on the corporation's books and a credit was entered in the corporation's cash account. The purchase payments were credited annually to the account of the corporation upon the partnership's books and the partnership's timber and timberland account *160 was debited. When the corporation cut timber under cutting contracts with the partnership, the corporation debited a log purchase account and credited the partnership's account with the amount of the contract price of the timber cut. At times, various other payments due the partners such as bonuses, dividends, etc., were also credited to the partnership's account rather than being paid to the partners. These credit entries were made monthly. The amount of the total contract price for timber cut and removed by the corporation during each fiscal year was debited to the corporation's account upon the books of the partnership, and was credited to an account entitled "Stumpage Sales" upon the books of the partnership. The partnership's debits and credits were generally made annually. Subsequent to August 31, 1946, various mining claims and interests in oil wells, oil well drilling equipment, and M. & L. Stock Ranch were acquired by the partnership. Legal title to these assets was taken in the joint names of A. F. Lowes and Ruth L. Lowes or in the name of A. F. and Ruth L. Lowes, husband and wife. For each interest thus purchased by the partnership, the corporation would issue a check *161 for the purchase price payable to the vendor. As each check was issued by the corporation, a debit was entered to the account of the partnership on the corporation's books and a credit was entered in the corporation's cash account. The payments were credited annually to the account of the corporation upon the partnership's books and were debited to the partnership's investment account or some other related asset account. Expenses incident to the ownership of timber, including property taxes, were paid for by checks issued by the corporation. These expenditures were debited to the partnership's account on the corporation's books. Corporation checks were also issued for various personal expenses of decedent and Ruth, including the cost of a personal residence and the payment of Federal and Oregon State individual income taxes. Such expenses were also debited to the partnership's account on the corporation's books. Withdrawals of corporate funds debited to the partnership's account were made for timber purchases and other purposes mentioned above as follows: Timber
Other
Total
Year
purchases
purposes
amount
1947
$ 43,237.85
$ 46,184.51
$ 89,422.36
1948
112,255.00
78,058.18
190,313.18
1949
19,572.50
99,293.16
118,865.66
1950
183,292.57
390,831.75
574,124.32
1951
$331,903.96
$ 268.501.45
$ 600,405.41
1952
4,450.00
313,380.04
317,830.04
1953
None
141,853.44
141,853.44
1954
4,680.00
70,400.65
75,080.65
Total
$699,391.88
$1,408,503.18
$2,107,895.06
*162 Although these withdrawals were consistently debited to the partnership's account, and the balance of the account was treated as accounts receivable on the corporate and partnership books, the corporate minutes contain no authorization for any loans or advances to its stockholders, no notes were given therefor, no agreement for repayment was made, and no interest was paid to the corporation. At all times subsequent to September 1, 1946, the partnership had adequate assets with which to pay all its then outstanding liabilities, including the balance due the corporation. Credits to the partnership's account from stumpage under the cutting contracts and from other sources during the fiscal years ending August 31, 1948 through 1954 were as follows, indicating whether the stumpage was from timber acquired before August 31, 1946 or after that date: [2]
Year ending
August 31
Acquired
Stumpage
Other
Total
1948
Prior to 9/1/46
$ 98,485.22
After 9/1/46
14,295.24
$112,780.46
$31,283.46
$144,063.92
1949
Prior to 9/1/46
55,086.75
After 9/1/46
42,475.65
$ 97,562.40
$11,432.97
$108,995.37
1950
Prior to 9/1/46
184,515.80
After 9/1/46
83,790.26
$268,306.06
$36,251.48
$304,557.54
1951
Prior to 9/1/46
105,923.23
After 9/1/46
315,762.24
$421,685.47
$59,199.11
$480,884.58
1952
Prior to 9/1/46
62,614.02
After 9/1/46
316,163.98
$378,778.00
$53,293.66
$432,071.66
1953
Prior to 9/1/46
27,403.14
After 9/1/46
123,994.85
$151,397.99
$56,827.74
$208,225.73
1954
Prior to 9/1/46
none
After 9/1/46
36,557.04
$36,557.04
$39,033.90
$ 75,590.94
*163 The balance due the corporation from the partnership at various dates from August 31, 1947 to August 31, 1957 was as follows: Amount
due corporation
Date
from partnership
8/31/47
$ 22.69
8/31/48
14,925.12
8/31/49
2,622.59
8/31/50
26,324.03
12/31/50
252,008.42
8/31/51
376,526.40
12/31/51
365,429.44
8/31/52
256,007.12
12/31/52
261,984.71
8/31/53
273,885.07
12/31/53
283,030.88
8/31/54
298,681.39
8/31/55
248,105.76
8/31/56
63,312.94
8/31/57
(9,252.97)
As the above table indicates, corporate advances to the partnership were repaid in the entirety by 1957. During the period from late 1945 to the winter of 1952-1953, the fair market value of timber in the area around the corporation's mill steadily increased. The prices stated in the timber cutting contracts between the partnership and the corporation were consistent with the *164 fair market values of the timber at the dates of the contracts. These prices were set at directors' meetings of the corporation and were established as the result of consultations between decedent, his accountant, and Dietrich. They attempted to set the prices which the corporation paid the partnership for the timber at the prevailing market price in the area. The price per thousand feet stated in the timber cutting contracts during each of the following periods was as follows: Amount
Period
per M feet
8/31/46 to 9/ 7/47
$ 6
9/ 8/47 to 2/28/50
10
3/ 1/50 to 8/31/50
12
9/ 1/50 to 12/31/50
15
1/ 1/51 to 3/ 1/53
20
The timber cut by the corporation during each of the fiscal years had a fair market value as of the first day of such years as follows: Value
Fiscal Year
per M feet
9/1/50 to 8/31/51
$15.00
9/1/51 to 8/31/52
20.00
9/1/52 to 8/31/53
20.00
9/1/53 to 8/31/54
12.50
Prior to March 1, 1953, the price paid by the corporation was in all instances the price stated in the timber cutting contract. In the winter of 1952-1953, the lumber industry in Oregon was depressed and the corporation began losing money. Accordingly, *165 on March 2, 1953, the partnership and corporation agreed to reduce the timber price for contracts thereafter entered into from $20 per thousand board feet to $12.50. In addition, the partnership and the corporation agreed that timber subject to cutting contracts at prices in excess of $12.50 per thousand feet should be reduced to that price. On August 26, 1953, the price for both existing contracts and for contracts to be entered into thereafter was again reduced, this time to $10 per thousand board feet. The reduction in contract prices in each instance was subject to cancellation on 30 days' notice. There were no written modifications of any of the contracts affected by the above two price changes, the reduction in prices being evidenced solely by the minutes of the meeting. The reduction from $20 to $12.50 per thousand board feet of March 2, 1953, affected 21 tracts of timber being cut by the corporation in the fiscal year ended August 31, 1953. The price change from $12.50 to $10 per thousand board feet of August 26, 1953 affected 7 tracts of timber being cut by the corporation in the fiscal year ended August 31, 1953. On March 3, 1954, at the special meeting of the directors *166 of the corporation it was decided to continue the stumpage price of $10 per thousand until August 31, 1954. After the death of A. F. Lowes on May 28, 1954, the market price of timber as of May 31, 1954, was established on the basis of a cruise and valuation report made of the partnership's timber properties. An agreement was entered into between the surviving partner and the corporation that the sale price per thousand board feet for all existing cutting contracts and all contracts entered into after May 31, 1954, would be the average appraised value per thousand board feet of timber of the tracts as stated in the cruise report. The average appraised value was found to be approximately $10. Timber prices increased thereafter and, at the request of Ruth, on March 22, 1955, the directors of the corporation, by resolution, rescinded this written agreement. The agreement was canceled as of April 1, 1955, and it was decided that the corporation would pay $17 per thousand board feet for all timber purchased from the partnership after April 1, 1955. On September 14, 1955, at the annual meeting of the directors of the corporation the stumpage prices were increased to $25 per thousand *167 board feet, which was considered to be the market price at that time. The price change from $10 to $17 per thousand board feet on March 22, 1955, and from $17 to $25 per thousand board feet on September 14, 1955, each modified four cutting contracts existing at the time. In accordance with Oregon law, Ruth, as surviving partner of the partnership, made an inventory of the partnership's assets which was filed with the Clackamas County Circuit Court on February 24, 1955. This inventory of partnership's assets listed the standing timber acquired both prior to and subsequent to August 31, 1946, as partnership property. The partnership employed approximately six persons in the tavern. Dietrich was employed by both the partnership and the corporation, but was paid by the corporation. In addition to serving as president of the corporation, decedent also helped Ruth operate the tavern, bought timber and made other investments for the partnership. Ruth devoted most of her efforts to working in the tavern. There is no evidence that the partnership advertised timber for sale, employed salesmen, or solicited offers from any buyers with respect to its timber. The uncut timber volume owned *168 by the partnership for the years 1946 through 1954 was as follows: Timber acquired
Year ending
Timber held on
subsequent to
August 31
August 31, 1946
August 31, 1946
Total
1946
54,580,197
None
54,580,197
1947
48,998,459
None
48,998,459
1948
39,149,937
30,010,658
69,160,595
1949
33,641,262
29,639,705
63,280,967
1950
16,660,553
34,140,899
50,801,452
1951
7,235,883
45,642,784
52,878,667
1952
3,526,761
28,847,818
32,374,579
1953
1,709,595
21,071,055
22,780,650
1954
1,709,595
17,699,900
19,409,495 Very little timber was acquired by the partnership subsequent to 1951, the above totals for the years 1952-1954 reflecting for the most part uncut timber acquired prior to 1952. Of the 110 separate parcels of timber owned by the partnership and purchased by the corporation under the timber cutting contracts. 88 were subject to forfeiture to third party landowners if the timber was not removed within the time given. The amount of time available for cutting after the execution of the various timber cutting contracts varied as follows: Number of
Remaining
parcels of
cutting or
timber subject
forfeiture period
to period
Months
0 - 3
6
3 - 6
8
6 - 9
12
9 - 12
7
12 - 18
21
18 - 24
7
Years
2 - 3
19
Over 3
9
*169 The corporation in every case succeeded in cutting the timber prior to the forfeiture date. During the fiscal year of the partnership ended August 31, 1952, the partnership made expenditures in the amount of $92,156.36 for the purpose of ascertaining the existence, location and extent or quality of any deposit of ore or other minerals. The individual partners did not make any other such expenditures nor were they members of any other partnership during that calendar year. There were no estates or trusts existing for the benefit of either of such individuals at any time prior to 1952. From the date of organization of the corporation until the death of A. F. Lowes on May 28, 1954, the directors of the corporation were A. F. Lowes, Ruth L. Lowes and R. F. Moran. The officers of the corporation were: A. F. Lowes, president, Ruth L. Lowes, vice-president, and R. F. Moran, secretary and treasurer. A. F. Lowes was the dominant force in the corporation and controlled its activities. In a year prior to the years in question, the corporation elected the benefits of section 117(k)(1). A summary of the gross sales of the corporation, gross profits from sales and net profit (or loss) for *170 each of the fiscal years 1947 to 1954, inclusive, is as follows: Fiscal Year
Net profit
ending August 31
Gross sales
Gross profit
(or loss)
1947
$1,163,145.38
$463,108.61
$345,972.12
1948
2,075,755.42
535,314.88
331,457.64
1949
1,442,564.76
348,020.33
122,788.77
1950
1,958,023.42
423,299.94
245,989.93
1951
3,039,370.52
715,817.99
433,323.24
1952
2,607,307.12
548,041.34
241,976.27
1953
1,449,972.88
146,914.45
(62,981.30)
1954
1,176.065.36
228,714.08
7,378.30
A summary of the dividends paid by the corporation and the earned surplus for the same fiscal years is as follows: Fiscal
Year ending
Earned
August 31
Dividends
surplus
1947
$10,000
$205,781.24
1948
10,000
395,399.38
1949
None
471,066.91
1950
20,000
598,324.87
1951
20,000
755,496.51
1952
20,000
880,611.44
1953
None
817,039.45
1954
None
858,784.52
The balance sheets attached to the partnership tax returns showed as assets all of the 27 tracts of timber owned by A. F. and Ruth L. Lowes as of August 31, 1946, and all the 110 tracts of timber acquired in their names subsequent thereto. The balance sheets of the corporation *171 did not show any of such timber as assets of the corporation. The partnership and the partners reported the difference between the cost of the timber and the stumpage paid therefor by the corporation as long-term or short-term capital gain, depending on the length of time elapsing between the acquisition date of the particular tract and the date the timber on the tract was allegedly disposed of by the execution of a cutting contract to the corporation. The partnership sold a few of the tracts to third parties but most of the timber was sold to the corporation. Respondent, in his notices of deficiency, treated the timber and timberlands logged by the corporation as having been acquired originally by the corporation and reduced the cost of sales reported by the corporation by the difference between the original cost of the timber and the stumpage paid under the cutting contracts with the partnership. Respondent also determined that certain amounts advanced by the corporation, exclusive of the amounts advanced for purchase of timber, for payment of personal expenditures of A. F. and Ruth L. Lowes and for investment in speculative ventures of the partnership constituted taxable dividends *172 to the individual stockholders. For protective purposes, respondent did not eliminate from the individuals' income the gains reported by them from the sale of timber to the corporation, and respondent admits this is a duplication of income if the ownership of the timber is held to be in the corporation. In their petitions, petitioners claim that the timber was originally acquired and owned by the partnership with funds borrowed from the corporation, that the subsequent sale of the timber to the corporation was a bona fide sale at arm's length at the fair market price of the timber, and that all amounts advanced by the corporation for purchase of timber, for investment in other partnership ventures, and for payment of personal obligations of the partners were loans to the partnership, as evidenced by the fact they were all repaid by the end of the year 1957. The timber and timberlands acquired in the names of A. F. Lowes and Ruth L. Lowes after August 31, 1946 belonged to the partnership when so acquired, not the corporation. Withdrawals of corporate funds by or for the use and benefit of A. F. Lowes and Ruth L. Lowes, and their partnership, during the calendar years 1951, 1952, *173 1953 and 1954 in excess of the credits to their accounts in each such year constituted dividends to Ruth L. Lowes and to A. F. Lowes or the estate of A. F. Lowes in equal shares. Opinion Timber Ownership The primary issue in these cases is whether the timber purchased in the name of A. F. Lowes and Ruth L. Lowes after August 31, 1946, and paid for with funds of the corporate petitioner, was acquired and owned by the corporation or by the partnership of A. F. and Ruth L. Lowes. Respondent, not relying on specific statutory provisions but rather on the factual issue involved, determined that the timber was in fact acquired and owned by the corporation, and disallowed as a cost of sales the difference between the original cost of the timber and the stumpage paid to the partnership. In support of his determination, respondent argues that taking title to the timber in the name of the partners and then selling the timber to the corporation under timber cutting contracts was simply an ingenious plan to minimize taxes and that the evidence and circumstances both support the conclusion that the timber was in fact originally acquired by or for the use and benefit of the corporation. *174 We do not believe the fact alone that one of the purposes of the plan whereby the timber was to be acquired by the partnership and sold to the corporation was tax minimization would permit treating the timber as being acquired in the first instance by the corporation. Taxpayers may still arrange their affairs in a manner permitted by law to minimize their taxes. Moline Properties v. Commissioner, 319 U.S. 436; Gregory v. Helvering, 293 U.S. 465; Coca-Cola Bottling Co. of Sacramento, 17 T.C. 101, affd. sub nom. Sellers v. Commissioner, 218 F. 2d 380 (C.A. 9). Respondent points to the facts, among others, that the timber purchased was essential to the existence of the corporation, was located within the logging area of the corporation, and that corporate funds were issued directly to the vendors in payment for the properties, as indicating that the timber was actually acquired by the corporation. Such facts indicate that the corporation possibly could have purchased the timber itself and that it may have been reasonable for it to do so, but they do not prove that the corporation did in fact acquire the timber from the original *175 vendors. Cedar Valley Distillery, Inc., 16 T.C. 870. Only by assuming that what was done here was essentially a sham and that the apparent transactions were in contravention of what really happened can respondent's determination on this issue be sustained. Burnet v. Commonwealth Imp. Co., 287 U.S. 415; John Sherwin, 46 B.T.A. 330. The evidence as a whole clearly establishes that the parties intended that the timber should be acquired and owned by the partners or the partnership (and we cannot understand how it would make any difference on this issue whether it was individually or partnership owned) and that it was so acquired and owned. The Lowes owned substantial timberlands prior to August 31, 1946 and had also owned and operated a sawmill. When the old mill burned and a new and much larger mill was built, they sought legal and tax advice as to the best way to set up the expanding operation. Their tax counsel advised that it would be beneficial taxwise, as well as for other reasons, to separate the logging operation from the ownership of the timber and other assets of the individuals. He suggested that a natural division of the business, *176 and a practical one for reasons such as limiting the liability of the individuals, was to incorporate the logging and sawmill operation and form a partnership to own the real estate and investment-type assets which the individuals considered they owned jointly but some of which were held in the name of one or the other of them. All subsequent purchases of timber and timberlands were to be made by the partnership with funds borrowed from the corporation if necessary, and the timber was to be sold to the corporation at stumpage market prices as the corporation needed it, the stumpage to be credited against the advances made by the corporation for the original purchase of the timber. It was felt that the open account thus established between the partnership and the corporation would remain at a fairly even amount. This plan was meticulously carried out, with two exceptions hereafter mentioned. The corporate petitioner was formed and the sawmill and land upon which it was located was transferred to it in exchange for all its capital stock, issued 50 per cent to each of A. F. and Ruth L. Lowes. A partnership agreement was executed which acknowledged that most of the remaining assets of *177 the individuals, including the timberlands but exclusive of the stock of the corporate petitioner, was partnership property. A timber cutting contract was entered into with the corporation each time the corporation entered into a new timber tract owned by the partnership. The stumpage called for in these contracts was admittedly the fair market value of the timber at that time. The books and records of both the corporation and the partnership clearly and carefully recognized and recorded the transactions as outlined above. The tax returns of all parties reflected the ownership of the timber by the partnership and, upon the death of A. F. Lowes, an inventory of the partnership's assets and liabilities, as required to be made by State law, included the timber and timberlands as partnership assets. The partnership engaged in other ventures, unrelated to the lumber business, with funds withdrawn from the corporation and charged to the partnership or partners' accounts, and respondent made no effort to treat these as corporate ventures. The partnership and the corporation were both real but separate entities and the timber and timberlands were originally acquired and owned by the partnership. *178 The only deviations from Dietrich's plan were as follows: During the first fiscal year of the corporation, the timberlands purchased were purchased in the name of the corporation. This was due to a misunderstanding of the recommendations made by the tax advisor, but after this was discovered most all timber was purchased in the name of A. F. and Ruth L. Lowes until August 1951. However, no attempt was made to correct the acquisitions made during the first year and there is no issue with respect to that timber. Decedent and Ruth also went beyond the plan recommended by Dietrich by withdrawing substantial sums from the corporation to pay personal expenses and to invest in unrelated speculative ventures in behalf of the partnership. But this does not prove or tend to prove that the corporation actually acquired the timberlands in the first place. Nor does the fact that corporate funds were used to purchase the timber require a conclusion that the corporation owned the timber. Telfair Stockton, 26 B.T.A. 801; Commissioner v. McCloskey, 76 F. 2d 373 (C.A. 5), affirming a Memorandum Opinion of this Court. The source of at least a part of the corporation's *179 funds in the first instance was profits from logging the timber owned by the individuals before the corporation was formed, and it would not be unreasonable for the corporation to advance funds to its timber supplier to obtain more timber any more than it was for the corporation to advance funds to its contract loggers who cut the timber for it. The question of ownership of this timber is one of fact and the intent of the parties is a material factor. Lanteen Medical Laboratories, Inc., 10 T.C. 279. Based on all the evidence, we think it is clear that the parties intended that both legal and beneficial ownership of the timber and timberlands here involved should originally be in the partnership and that this was accomplished. We have, therefore, decided this issue in favor of petitioners. Section 117(k)(2) The next issue, raised alternatively by respondent in his amended answer, is whether the proceeds reported by the partners from the cutting of timber by the corporation under the timber cutting contracts are entitled to capital gain treatment under section 117(k)(2). Respondent admits he has the burden of proof on this issue. *180 Section 117(k)(2) provides in part as follows: "(2) In the case of the disposal of timber * * *, held for more than 6 months prior to such disposal, by the owner thereof under any form or type of contract by virtue of which the owner retains an economic interest in such timber * * *, the difference between the amount received for such timber * * * and the adjusted depletion basis thereof shall be considered as though it were a gain or loss, as the case may be, upon the sale of such timber * * *" Under section 117(j) the net gains from the sale of timber with respect to which section 117(k)(2) is applicable (plus the recognized gains from involuntary conversions) are accorded long-term capital gain treatment. An economic interest is defined by Regulations 111, section 29.23(m)-1, as follows: "An economic interest is possessed in every case in which the taxpayer has acquired, by investment, any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the severance and sale of the *181 mineral or timber, to which he must look for a return of his capital. * * *" To qualify under section 117(k)(2), the taxpayer must be the "owner" of timber, must have held the "timber * * * for more than 6 months prior to such disposal," and the disposal of timber must be "under any form or type of contract by virtue of which the owner retains an economic interest in such timber." For purposes of this alternative issue, respondent concedes that the partnership was the "owner" of the timber and had held the timber here in issue for more than 6 months. The question remains as to whether under the timber cutting contracts executed by the partnership and the corporation, the partnership disposed of the timber under a contract by virtue of which the partnership retained an economic interest. Respondent argues that the timber cutting contracts were simply unilateral licenses to enter and cut the timber, which were not binding on either party, and hence, did not constitute a disposal of the timber at the time the contract was made, and consequently, the timber was not disposed of until a tree was cut and paid for, after which time the partnership retained no economic interest in the *182 timber. Respondent relies principally on Ah Pah Redwood Co. v. Commissioner, 251 F. 2d 163 (C.A. 9), remanding on other grounds 26 T.C. 1197; George L. Jantzer, 32 T.C. 161; and Anderson v. Moothart, 198 Or. 354, 256 P. 2d 257, the latter for the proposition that the cutting contracts created only licenses to cut and remove timber revocable at any time at the will of the licensor, and, therefore, did not result in the sale or disposal of the timber. While the timber cutting contracts here involved did not include specific language to the effect that the corporation agreed to buy the timber, the contracts do state that in consideration of the "mutual covenants herein contained," the partnership "does hereby agree to sell" to the corporation "all the timber" on the premises. The contract did not specifically mention any promise or covenant on the part of the buyer. However, the evidence and actions of the parties indicate that there was at least an implied promise on the part of the corporation to buy the timber. The evidence discloses that the board of directors of the corporation adopted a resolution on September 8, 1947 directing *183 that the corporation "purchase timber from A. F. and Ruth L. Lowes and cut such timber and pay" to the seller the stumpage price provided therein. The parties executed a separate timber cutting contract each time the corporation entered a new tract. The contract refers to mutual covenants and it is reasonable to assume that this referred to an agreement on the part of the corporation to buy the timber and pay the price specified therefor. The draftsman of the contract form testified that it was his intent and the intent of the parties that when the corporation executed a contract, it was obligated to cut and remove all of the merchantable timber on the tract. The evidence also indicates that in every instance the corporation did cut and remove all the timber on each tract before the time for doing so expired. It is unreasonable to believe that the seller would agree to sell all the timber on a tract, which in most instances had to be cut within a limited time, without the agreement of the buyer to cut and remove all the timber on the tract. Oregon, under whose laws these contracts must be interpreted, follows the well established rule "that courts should incline, where such a construction *184 is reasonable, to construe a contract in favor of mutuality." Ward v. McKinley, 97 Or. 45, 191 Pac. 322, 324. As is said in 1 Corbin, Contracts (1st ed. 1950), sec. 144, p. 456: "An implied promise is not prevented from being a sufficient consideration by the fact that it is implied from conduct or from words that are not in express promissory form." Further, it appears from the oral testimony of Dietrich, who suggested the plan and drafted the instruments, that there was in fact, or was intended to be, an oral promise on the part of the corporation to buy the timber. Respondent objected to Dietrich's testimony on this point, but we have admitted it as an aid in the interpretation of and not in contradiction of, the terms of the written agreement which are not clear or complete in themselves. 3 Corbin, Contracts (1st ed. 1950), sec. 579, p. 253. In our opinion, the timber cutting contracts were valid and binding bilateral contracts. We are also of the opinion that the timber cutting contracts must be interpreted to be a "disposal" of timber referred to therein at the time the contracts were signed and that under the contracts the partnership retained an economic interest *185 in the timber within the meaning of section 117(k)(2). On this point, we think L. D. Wilson, 26 T.C. 474, is controlling and that Ah Pah Redwood Co. v. Commissioner, supra, and George L. Jantzer, supra, are distinguishable. We held in Spingfield Plywood Corporation, 15 T.C. 697, that the term "disposal," as used in section 117(k)(2), was not synonymous with a "sale," and that "something other than a sale was sufficient" to qualify under the statute, and that even without a sale, the statute is satisfied. In L. D. Wilson, supra, we held that an unwritten agreement between a partnership and a corporation, owned by the partnership, under which the partnership agreed to sell stumpage to the corporation at a specified price as needed, such arrangement to continue until the happening of a designated contingency or until it was discontinued with mutual consent, constituted a disposal of the timber by the partnership under a contract by virtue of which the partnership retained an economic interest in the timber. As pointed out in the opinion in that case, the partnership's retention of the economic interest in the timber *186 was evidenced by the fact that it looked to a severance of the timber for a return of its investment. In Ah Pah Redwood Co., both this Court and the Circuit Court found that the arrangement, whereby the logging company was "allowed" to start cutting timber and "pay therefor $5 per thousand feet as removed" did not constitute a contract and, therefore, did not constitute a disposal of the timber within the meaning of subsection (k)(2). In the Jantzer case, this Court was concerned primarily with whether petitioner was the owner of the timber disposed of, which question we do not have here. The question of whether there was a contractual disposal of timber with an economic interest retained was raised with respect to one of the tracts involved in the Jantzer case, but the Court concluded on the evidence that the loose oral arrangement between the partnership and the corporation, which could be terminated at will and under which the corporation accepted no risk, gave no consideration and was under no obligation to cut any amount of timber, was not a contractual disposal of the timber. Both of these cases are factually distinguishable from this case. It would also appear from the legislative *187 history of section 117(k)(2)[3] that whether these timber cutting contracts are considered to be a sale of the timber or a license to cut the timber, they accomplish a disposition of the timber in a manner which Congress intended should be accorded capital gain treatment, provided the timber had been held for more than 6 months prior to the time the contract was executed. Cf. Boeing v. United States, 98 F. Supp. 581 (Ct. Cl. 1951). Under the terms of these contracts the partnership bound itself to sell the timber for a specified price, agreed to permit the corporation to enter upon the land to cut and remove the timber, and the only means by which the partnership could recover its investment in the timber was from the income to be derived from the severance of the timber. This clearly amounts to a disposition of the timber under a contract by virtue of which the partnership retained an economic interest in the timber within the meaning of the statute and regulations. Section 117(a) Our conclusion that the partnership income from stumpage is entitled to capital gain treatment under section 117(k)(2) *188 makes it unnecessary for us to decide whether that income qualifies for capital gain treatment under section 117(a). Loans v. Dividends The next issue is whether the funds withdrawn from the corporation for the use or benefit of the partners and/or the partnership should be treated as loans or dividends. In his notice of deficiency respondent determined that all such advances or withdrawals from the corporation, totaling $470,982.34, exclusive of amounts advanced for timber purchases, constituted taxable dividends to A.F. and Ruth L. Lowes. By amended answer respondent claims in the alternative that the difference between the stumpage credited to the partnership's account under the cutting contracts and the cost of the timber acquired after August 31, 1946, totaling $364,711.51, constituted dividends to the individuals. Section 115(a) defines a dividend as any distribution made by a corporation to its shareholders (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year. There is no dispute here that the accumulated *189 earnings and profits of the corporation were in excess of the amounts charged to the individual stockholders as dividends. Whether a withdrawal of corporate funds is a loan or a dividend is a factual question to be determined upon consideration of all the facts and circumstances. Clark v. Commissioner, 266 F. 2d 698 (C.A. 9), affirming in part and reversing in part T.C. Memo. 1957-129; Wiese v. Commissioner, 93 F. 2d 921 (C.A. 8), affirming 35 B.T.A. 701, certiorari denied 304 U.S. 562; Ben R. Meyer, 45 B.T.A. 228. But the definition of a dividend is broad in scope and, when coupled with the presumption that respondent's determination is correct, petitioners must establish affirmatively that the withdrawals were not dividends to fall without the scope of the statutory provision. W. T. Wilson, 10 T.C. 251, affd. 170 F. 2d 423 (C.A. 9), certiorari denied 336 U.S. 909. The evidence indicates that the plan proposed by Dietrich contemplated a borrowing of corporate *190 funds by the partners to purchase timber to be repaid out of stumpage credits. It was anticipated that the credits to the account would repay the advances and the balance in the account would not be large at any time. However, decedent, who had complete control of both the corporation and the partnership's affairs, went far beyond this plan. He directed the fiscal officer of the corporation to issue corporate checks in payment for investments in numerous speculative ventures entered into by the two stockholders or their partnership, for a personal residence for the stockholders, and for personal expenditures of the stockholders. This was done without specific authority of the board of directors of the corporation, upon open account, and no notes were given to the corporation, and no interest was paid. It is true that stumpage payments and other payments due the individuals, such as decedent's bonuses and occasional cash and miscellaneous payments, were credited against these withdrawals, but the withdrawals far exceeded the credits until after decedent's death. That this was not according to plan was evidenced by Dietrich's testimony that when he discovered to his "horror" in 1951 *191 that the debit balance in the individuals' drawing account was over $376,000 he immediately advised decedent against further withdrawals. Decedent stopped withdrawing funds for timber purchases but continued to draw on corporate funds for personal purposes. Petitioners rely heavily on the facts that both the corporate and partnership's books showed the balance in the account as a loan, and that the account was paid off in full by the end of the year 1957. The fact that the account was carried on the books as a loan is evidentiary, but is not decisive, M. Jackson Crispin, 32 B.T.A. 151; and the fact that the account was eventually paid off must also be given weight; but it is the intent at the time of the withdrawal, not at some later date, which is determinative. Wiese v. Commissioner, supra. The Lowes deliberately chose to separate the logging operation from the ownership of the timber by use of a wholly owned corporation, and claimed the advantages of such an arrangement. They must also accept the disadvantages of this form of doing business. They cannot withdraw corporate funds at will for their own personal use, or the use of their partnership, *192 without formally declaring dividends, and thus have the benefit of a large part of the corporation's earnings without paying the dividend tax thereon, by merely having the amounts so withdrawn charged against their accounts on the books of the corporation. Elliott J. Roschuni, 29 T.C. 1193, affirmed per curiam 271 F. 2d 267 (C.A. 5), certiorari denied 362 U.S. 988 (May 23, 1960); C. W. Murchison, 32 B.T.A. 32; M. Jackson Crispin, supra.While the evidence indicates that the parties intended the temporary withdrawals for purchase of timber to be loans, it does not support a conclusion that decedent had any intention one way or the other with respect to repayment of the amounts withdrawn for other purposes except to permit any excess stumpage payments to repay the excess withdrawals when and if they exceeded the amounts withdrawn for timber purchases. This is not sufficient to overcome respondent's determination that at least a part of the withdrawals was essentially equivalent to dividends. However, we do not agree with either of respondent's computations of the amount to be treated as being essentially equivalent *193 to a dividend. Both respondent's original and alternative computations are predicated on the theory that the timber was owned by the corporation and the timber sales from the partnership to the corporation should be ignored. We have found that the partnership owned the timber and that the difference between the cost of the timber and the stumpage credited to the partnership's account was income to the partnership and not the corporation. We also think it is reasonable to assume that withdrawals for partnership or personal use would be made first from any excess of funds credited to the partnership's account during each calendar year over funds advanced for the purchase of timber during that calendar year, and only the excess of withdrawals for all purpose during a calendar year over the credits to the partnership's account from all sources during the calendar year would be withdrawals of corporate funds taxable to the stockholder-partners as dividends for that calendar year. The dividend question before us involves only the calendar years 1951 through 1954 for petitioners in Docket No. 71690, and we do not decide the character of the withdrawals either prior to or subsequent to those *194 years. Consequently, any excess of credits to the partnership's account over debits to the account in any of the years mentioned above would be credited to the debit balance shown to be due from the partnership on the corporate books as of December 31, 1950. As a result any excess of credits over debits during any of these calendar years would not be available as a credit against excess withdrawals in subsequent years. Thus, the computation of amounts taxable as dividends should be made on an annual calendar year basis, which would seem to be more realistic under the circumstances. This computation can be made under Rule 50 from the evidence submitted. Allocation of Dividends The next issue involves the proper allocation of alleged dividends representing withdrawals made during the year 1954 after the death of A. F. Lowes on May 28, 1954. Respondent contends that all net withdrawals of corporate funds after that date were made by Ruth for her individual use and benefit and should all be treated as dividends to her and included in the joint return of Ruth and decedent for the year 1954. A part of these alleged dividends is eliminated by virtue of our conclusion that the timber *195 was owned by the partnership rather than the corporation. But in any event, upon the death of A. F. Lowes, his estate became the owner of one-half of the stock of the corporation and one-half of the partnership's assets. The excess withdrawals after May 28, 1954 were used by the partnership's assets, and were attributable one-half to Ruth and one-half to the estate of A. F. Lowes. Section 117(k)(1) The final issue for discussion is whether the corporate petitioner is entitled to the benefits of section 117(k)(1) with respect to timber cut under the cutting contracts with the partnership during its taxable years ending August 31, 1951 and 1952. Section 117(k)(1)[4] provides in part that if a taxpayer so elects on his return for a taxable year, the cutting of timber during such year by the taxpayer "who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year," and that such election once made, shall be binding upon the taxpayer in subsequent years unless respondent *196 permits him to revoke his election. *197 It is not disputed that corporate petitioner, in a prior year, had elected the benefits of section 117(k)(1) and was bound by such election during the taxable years. See Regs. 111, sec. 29.117-8(a)(1). Respondent recognizes that if the corporation owned the timber, it is entitled to the benefits of section 117(k)(1), but contends that with respect to all timber not owned by the corporation, it is not entitled to the benefits of section 117(k)(1) for failure to show compliance with the 6 months' holding period. Respondent's latter contention is based on the premise that the timber cutting contracts between the partnership and the corporation did not constitute valid contracts, being more in the nature of a continuing offer to sell, which offer was accepted by the corporation with respect to each tree, through the corporation's act of cutting and paying for that tree. We have heretofore found that the timber cutting contracts were valid enforceable contracts and constituted a disposal of the timber at the time the contracts were signed. This requires that this issue be decided in favor of petitioner with respect to timber cut during the taxable year under a timber cutting contract *198 executed more than 6 months prior to the beginning of such year, because if the cutting contracts were valid, they gave the corporation the right to cut and sell the timber and constituted "a contract right to cut" the timber within the meaning of the statutes regardless of whether title passed immediately or upon the cutting of the timber. United States v. Johnson, 257 F. 2d 530 (C.A. 9). New Ground for Disallowing Loss Raised on Brief - Burden of Proof One further issue bears comment. In Docket No. 71690 respondent, in his notice of deficiency, disallowed a claimed loss of $15,544.12 resulting from the sale of timber reported on the partnership return for the period September 1, 1953 to May 31, 1954, on the ground that the timber belonged to the corporation and the loss was therefore attributable to the corporation, not the partnership. This point has previously been disposed of against respondent. For the first time on brief, respondent claims that two of the tracts giving rise to $5,680 of the claimed loss were not shown to have been sold during the taxable period, and hence, the loss was not sustained during that period. This ground for disallowing the loss *199 was not raised in the pleadings nor at any time which would have permitted petitioners to put on proof with respect to when the loss was sustained. While this may not raise a new issue, when respondent departs from the grounds relied on in this deficiency notice to sustain a theory later raised, he has the burden of proving any new matter raised. Leon Papineau, 28 T.C. 54; Sheldon Tauber, 24 T.C. 179. * We think this argument of respondent requires proof of new matter; to hold otherwise would require a taxpayer to attempt to anticipate all grounds upon which respondent might conceivably rely in support of his determination on a particular issue. There is not sufficient evidence in the record from which we can determine with certainty when the tracts giving rise to the claimed loss were sold. Respondent has not carried his burden of proof on this new theory and the entire issue must be decided for petitioners. We believe all other issues raised by the pleadings have either been resolved by our conclusions *200 above or have been conceded by the parties. Decisions will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939 unless otherwise indicated.↩
2. The only tabulations of credits presented by either party are on a fiscal year basis. There are also minor discrepancies in the figures submitted by the parties. However, copies of the accounts are in evidence and these discrepancies, as well as the calendar year figures, can be computed under Rule 50.↩
3. See S. Rept. No. 627, 78th Cong., 1st Sess., pp. 25, 26.↩
4. SEC. 117. CAPITAL GAINS AND LOSSES. (k) Gain or Loss Upon the Cutting of Timber. - (1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. In case such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this paragraph such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding upon the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Commissioner, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however, shall preclude any further elections under this paragraph except with the consent of the Commissioner.↩
*. Previous citation was deleted and new citation was added by an official order of the Tax Court, dated July 6, 1960 and signed by Judge Drennen↩.